**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **AURELIO TARAZONA CARVAJAL,** | § | |
| **EDUAR HURTADO GARCIA,** | § | |
| **ELKIN HUMBERTO GÓMEZ PINTO,** | § | |
| **FREDY ALEXANDER HERRERA** | § | |
| **PICO, JAIRO ANDRÉS ARDILA** | § | |
| **PEÑA, JORGE ELIECER DIAZ** | § | |
| **GALVIS, WILSON FABIAN PEÑA** | § | Civil Action No. _3:23-cv-245__ |
| **CASTILLO, JUAN DAVID GARCÍA** | § | |
| **RODRIGUEZ** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **MIJELUM, L.L.C.** | § | |

**PLAINTIFFS'/COUNTER-DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT AS TO MIJELUM'S COUNTER-CLAIMS AND**
**AFFIRMATIVE DEFENSES AND FOR SUMMARY JUDGMENT AS TO**
**PLAINTIFFS' CLAIMS FOR VIOLATIONS OF THE FLSA**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME **AURELIO TARAZONA CARVAJAL, EDUAR HURTADO GARCIA, ELKIN HUMBERTO GÓMEZ PINTO, FREDY ALEXANDER HERRERA PICO, JAIRO ANDRÉS ARDILA PEÑA, JORGE ELIECER DIAZ GALVIS, WILSON FABIAN PEÑA CASTILLO, AND JUAN DAVID GARCÍA RODRIGUEZ**, and file this, their Motion for Summary Judgment as to Mijelum's Counter-Claims and Affirmative Defenses and for

1

Summary Judgment as to Plaintiffs' claims for violations of the FLSA.  In support

thereof, Plaintiffs would show the Court as follows:

## I.
## SUMMARY OF THE ARGUMENT

**A. Mijelum's Counter-Claim for conversion against Plaintiffs is baseless speculation.**

> 'Q. Okay. So today, you have no knowledge or evidence that any of the plaintiffs took the vehicle?
> A.  No.
> Q. Okay. Any other claims that you have against my clients, other than the counter-claim for which you have no evidence?
> A.  No. *Exhibit 1 excerpts from the deposition of Leon Mucharraz, one of the two sole owners of Defendant Mijellum, L.L.C., at 72:19-72:25.*"

**B. Mijelum's 12 affirmative Defenses are baseless and Plaintiffs are entitled to Summary Judgment.**

1.      In *Reyes v. Aqua Life Corp.* 632 Fed. Appx. 522, 555-556 (11th Cir.

2015), the Court stated: "An employer who seeks to avoid liquidated damages bears

the burden of proving to the court that its violation was 'both in good faith and

predicated upon such reasonable grounds that it would be unfair to impose upon him

more than a compensatory verdict.' *Reeves v. Int'l Tel. & Tel. Corp., 616 F.2d 1342,*

*1352 (5th Cir. 1980)* (quoting *Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464,*

*468 (5th Cir. 1979)).* 'Before a district court may exercise its discretion to award

less than the full amount of liquidated damages, it must explicitly find that the

employer acted in good faith.' *Joiner v. City of Macon,* 814 F.2d 1537, 1539 (11th

Cir. 1987)."

**C. Plaintiffs should be granted Summary Judgment on their cause of action under the FLSA as the Defendant cannot support its claims they were paid correctly.**

"Q. Okay. So you can't tell the court or the jury today how much you paid each of these employees in cash, right?
A. No.
Q. Okay. You can't tell the judge or the jury today whether they were properly paid for all hours worked because you kept no records of it when you paid them in cash, right?
A. Probably not, uh-huh.
Q. Okay. And so, with regard to all these employees, you have no way of verifying that they were paid at the proper rate of pay for all the hours worked because you kept no such records, right?
A. Correct."

*Exhibit 1 excerpts from the deposition of Leon Mucharraz, one of the two sole owners of Defendant Mijellum, L.L.C., at 26:24-27:12.*"

## II.
## SUMMARY JUDGMENT STANDARD

2.      Summary judgment is appropriate when the pleadings, affidavits, and other summary judgment evidence show that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). One of the greatest dangers of a summary judgment is its ability to dispose of cases without trial, and, improperly used, depriving a litigant of his day in court.  *City of Corpus Christi v. McCarver*, 253 S.W.2d 456, 459 (Tex. Civ. App--San Antonio 1952, no writ).  Therefore, the standards for establishing a right to summary judgment are extremely demanding.

*Gulbenkian v. Penn*, 252 S.W.2d 929,931 (Tex. 1952). The moving party bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322–25. Only in this way may a court ensure that a party is not deprived of the constitutional right to a jury trial. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).

3.    The United States Supreme Court reminded us that courts cannot resolve genuine disputes of fact in favor of the moving party, especially where there are competing affidavits. *Tolan v. Cotton*, 134 S. Ct. 1861, 1868 (May 5, 2014); *See also Brosseau v. Haugen*, 543 U.S. 194, 195, n. 2, 125 S.Ct. 596, 160 L.Ed.2d 583(2004)(per curiam).

4.    In ruling on a motion for summary judgment, a judge's role is to determine whether there is a genuine issue for trial, not to weigh the evidence and determine the truth of the matter. *Tolan v. Cotton* at 1866.

### III.
### FACTUAL BACKGROUND

5.    Defendant Mijelum performs highway maintenance work under contracts with the Texas Department of Transportation. *Exh. 1 at 35:20-37:20*. This work includes guardrail work, striping, bridge repair, and road maintenance. *Id*.

6.    The eight Plaintiffs in this case worked for Defendant as Highway Maintenance workers in 2021 and 2022. *Exh. 1 at 5:14-6:10*. The eight Plaintiffs were all employed by Defendant under the H-2B visa program. *Exhibit 3 – 2021*

4

*HB Application; Exhibit 4 – Texas Job Order.*

7.    Under the H-2B Temporary Non-Agricultural Program, Businesses can apply for certification to get visas for foreign nationals to perform work when there are not sufficient willing and able qualified U.S. Workers. *Exhibit 40 – January 27, 2021 DOL Notice of Certification.*

8.    In this case, Defendant Mijelum sought and received certification to get visas to hire Highway Maintenance workers in both 2021 and 2022. *Exh. 40; Exhibit 41 – 2022 Certification.*

9.    As part of that program, the employer agrees to comply with the requirements of 20 CFR Part 655, Subpart A. *Exh. 40 at JAS 2044.* This is more than just an agreement, the employer attests that they will comply subject to the penalty of perjury. *See Exh. 40 at JAS 2046; Exh. 41 at JAS 613*:

10.    The requirements include recordkeeping requirements for earnings and hours worked. *20 C.F.R. 655.20(i).* These records must be kept for three years. *Exh. 40 at JAS 2044.*

11.    A key part of the H-2B program is the requirement that the employer pay the "prevailing wage." *Exhibit 42 – Authorization to Submit Prevailing Wage Request.* Also, the employees must work only in the area of intended employment that was approved as part of the petition. *Exh. 42; 655 C.F.R. §655.20(x)*

12.     The Plaintiffs in this case were hired by Defendant Mijelum through the H-2B program.  They were given a Spanish version of the approved Job Order as an application.  *See Exhibit 12 – English version of Job Order; Exhibit 8 – Job Order from Carvajal Employee File.  Exhibit 9 – Job Order from Pico Employee File, Exhibit 10 – Job Order from Castillo Employee File, Exhibit 11 – Job Order from Rodriguez Employee File, Exhibit 18 – Job Order from Pinto Employee File, Exhibit 19 – Job Order from Garcia Employee File, Exhibit 20 – Job Order from Diaz-Galvis Employee file.*  Note that while some of these are not signed, they were produced this way by Defendant as part of each individual's employee file.

13.     Plaintiffs' entitlement to work in the United States is contingent on the H-2B visa.

14.     Mijelum's owners are Leon Mucharraz and Luis Mucharraz.  *Exh. 1 at 7:08-7:13; Exh. 2 at 04:16-04:18; 05:05-05:25*. Leon is a Manager and President of Mijelum LLC. *Exh. 1 at 07:17-08:20.* Luis is a Manager and Vice-President. *Id.*

15.     Leon Mucharraz and Luis Murcharraz were responsible for determining payroll, rates of pay, and hours of work.  *Exh. 1 at 8:21-9:08; Exh. 2 at 5:05-06:14.*

16.     Both Leon Mucharraz and Luis Mucharraz understood that they were required to pay for all regular hours worked up to 40 and time and a half for hours worked in excess of 40 during a week.  *Exh. 1 at 11:24-12:15;*

17.     Mijelum LLC did highway work under contracts that required

compliance with state and federal law. *Exh. 2 at 07:02-07:17*. Luis and Leon reviewed the contracts. *Id*.

18.    The contracts involved repairs on several highways including US 90. *Exhibit 23 – Excerpts from Contract 04202403 at JAS 764; Exhibit 24 – Excerpts from Contract 04212401 at JAS 1350; Exhibit 25 – Excerpts from Contract 04212402 at 1498;*

19.    The contracts included for FHWA-1273 – "Required Contract Provisions Federal-Aid Construction Contracts." *See Exhibit 22 – Excerpts from Contract 04202402 at JAS 704-715; Exh. 23 at JAS 831-842; Exh. 25 at JAS 1546-1557; Exhibit 26 – Excerpts from Contract 10202407 at JAS 1151-1162.*

20.    These contracts require that the contractor submit accurate and complete time and payroll records. *Exh. 22 at Jas 708*; *Exh. 23 at JAS 835; Exh 25 at JAS 1550; Exh. 26 at JAS 1155; Exh. 27 at JAS 998*. They are also required to pay overtime. *Exh. 22 at JAS 710*; *Exh. 23 at JAS 837; Exh. 25 at JAS 1552; Exh. 26 at JAS 1157; Exh. 27 at JAS 1000;*

21.    Leon Mucharraz signed the contracts on behalf of Mijelum. *Exh. 22 at JAS 44; Exh. 23 at JAS 872; Exh. 25. at JAS 1616; Exh. 26 at JAS 1190; Exh. 27 at JAS 1082*.

### A. 2021 Employees – Work Performed

22.    Plaintiffs Aurelio Tarazona Carvajal, Fredy Alexander Herrera Pico,

Wilson Fabian Peña Castillo, and Juan David Garcia Rodriguez, and Galvis worked for Defendant in 2021 ("2021 Employees").  *Exhibit 5 – Aurelio Tarazona Carvajal Sworn Statement and Translation*; *Exhibit 6 – Fredy Alexander Herrera Pico Sworn Statement and Translation*; *Exhibit 7 – Wilson Fabian Peña Castillo Sworn Statement and Translation; Exhibit 17 – Jorge Galvis Statement; Exhibit 43- Declaration of Juan David Garcia.*

23.    Carvajal, Pico, and Castillo worked for Defendant from May 23, 2021 to December 21, 2021.  *Exh. 5 at pg. 5; Exh. 6 at Mijelum Employee FLSA 143; Exh. 7 at Mijelum Employee FLSA 197-198*.

24.    Mijelum received a notice of certification for H-2B Temporary Non-Agricultural workers allowing them to hire 12 highway maintenance workers from April 2021 until December 21, 2021.

25.    The employees were presented with "H-2B Job Orders" that were translated from the approved job Order Information.  *Exhibit 8 – H-2B Job Order from Carvajal Employee File*; *Exhibit 9 – H-2B Job Order from Pico Employee File; Exhibit 10 – H-2B Job Order from Castillo Employee File; Exhibit 12 – English version of Job Order.*

26.    Under the approved terms, the employees were to work from 7:00 am to 4:00 pm for 40 hours per week with variable overtime.  *Exh. 12 at JAS 2057*. Their job title was Highway Maintenance worker.  *Id*.

27.    The employees were also to be provided daily subsistence at a rate of $12.68 per day during travel to a maximum of $55.00 per day with receipts. *Exh. 12 at 2057-2058*. They were also to be reimbursed visa, visa processing, border crossing & other related fees. *Id.*

28.    The 2021 Employees started working for Mijelum in May of 2021. *Exhibit 5 – Statement and translation of Statement of Carvajal at pg. 1*; *Exhibit 6 Statement and translation of Statement of Pico at Bates 142; Exhibit 7 – Statement and translation of statement of Castillo at Bates 195*.

29.    The Plaintiffs were required to perform work at the Mijellum LLC yard in addition to the work they did on highway maintenance.

30.    Mijelum LLC has a company yard that has vehicles, animals, apartments and other buildings. *Exh. 5 at pg. 2*.

31.    The Plaintiffs were required to work at the yard both before and after their highway maintenance work. *Exh. 5 at pg. 2*.  The yard had animals including horses, chickens, goats, rabbits, and turkeys. *Exh. 5 at pg. 2*.  The Plaintiffs were required to care for the animals. *Exh. 5 at pg. 2; Exh. 6 pg. 142. Exh. 14 pg. 114. Exh. 15 at pg. 118; Exh. 17 at pg. 2*.  The Plaintiffs were required to clean the yard, pick up garbage, weed trees, clean vehicles, and perform construction and repair work on apartments on the yard. *Exh. 5 at pg. 2; Exh. 6 pg. 142; Exh. 7 pg. 197; Exh. 14 pg. 114.  Exh. 15 at pg. 118*.

32.     The work on the yard would begin anywhere from 4 am to 7 am. *Exh. 5 at pg. 2*; *Exh. 7 at pg. 198-199; Exh. 14 pg. 114. Exh. 15 at pg. 118-119*. After the Plaintiffs were done with their highway maintenance work they would return to the yard and resume working until 7-9 pm. *Exh. 5 at pg. 2*.

33.     The Plaintiffs also had to work on a property owned by Luis Mucharraz. *Exh. 5 at pg. 9*; *Exh. 7 at pg. 199*.

**B. 2022 Employees – Work Performed**

34.     Plaintiffs Aurelio Tarazona Carvajal, Eduar Hurtado Garcia, Elkin Humberto Gomez Pinto, Fredy Alexander Herrera Pico, Jairo Andres Ardila Peña, Jorge Eliecer Diaz Galvais, and Wilson Fabian Peña Castillo worked for Defendant in 2022. ("2022 Employees").  *Exh. 8; Exhibit 18 - HB-2 Job Order from Pinto Employee File; Exhibit 19 - HB-2 Job Order from Garcia Employee File; Exh. 9; Exhibit 20 - HB-2 Job Order from Galvais Employee File; Exh. 10.*

35.     Carvajal, Peña, Galvis, and Pico began working for Defendant on April 22, 2022.  *Exh. 5 at pg. 7.*  Garcia, and Pinto began working for Defendant on May 12, 2022.  *Exh. 5 at pg. 8.*

36.      The 2022 Employees would work from 6:30 am to 7:30-8 pm.  *Exh. 5 at pg. 7; Exh. 14 at 114; Exh. 15 at 118-119; Exh. 17 at 2.*  Sometimes they would be required to work beginning before 5 am if there were road closures.  The 2022 Employees worked 6 days a week.  *Exh. 5 at pg. 12.*  Their pay would vary from

$300.00 to $600.00 per week. *Exh. 5 at pg. 8; Exh. 6 at 144; Exh. 16 at pg. 3*. They were paid $700.00 per week for the first three weeks they were in Odessa. *Exh. 5 at pg. 8; Exh. 6 at 144*. The employees were paid in cash, they did not receive paychecks. *Exh. 6 at 144; Exh. 15 at 118*. The employees were not paid overtime. *Exh. 14 at 114*.

37.    Before and after the 2022 Employees did road work they were required to clean the stables belonging to Leon Mucharraz. *Exh. 5 at pg. 9*. They were also required to repair the Mijelum yard and lay concrete floors around the offices. *Id*.

38.    The 2022 Employees would also be sent to work on land belonging to Luis Mucharraz, including construction work on a house, excavation, casting concrete and installing beams and foundations for the house. *Exh. 5 at pg. 9; Exh. 6 at 144; Exh. 7 at 199; Exh. 14 at 114*.

## IV.
## ARGUMENT AND AUTHORITIES

**Summary Judgment should be granted in favor of Counter-Defendants' Galvis, Garcia, Carvajal, and Pico on Counter-Plaintiff Mijelum's cause of action for conversion.**

39.    Mijelum has asserted a Counter-Claim for Conversion against Plaintiffs Galvis, Garcia, Pinto, Carvajal, and Pico. *Dkt. 23 at 57-69*.

40.    The elements of a conversion claim are (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the

exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 684 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To recover for conversion, a plaintiff must also prove damages that are the proximate result of the defendant's conversion. *Id*. at 685.

41.     The key element in this case is the second element, whether the Defendants exercised control over the property.  Leon Mucharraz, Defendant's owner and the person who filed a police report regarding the alleged theft was asked about the incident in his deposition:

> "Q. (BY MR. PONCIO)· You made a call that said that one of my clients was -- and that was you that made the report, right?
>
> A. Yes.
>
> Q. And you said that there was unauthorized use of a vehicle.
>
> A.· Correct.
>
> Q. Can you tell me about that?
>
> A. When I came back from Colombia, and I believe Wilson told us the guys -- the other guys were gone, or the -- however many of them, at the time. My brother was in Odessa, or he went to Odessa And he noticed the truck was not there.
>
> Q. Uh-huh.
>
> A. So we thought maybe they had taken it.
>
> Q. Had they taken it?

A. I don't know.

Q.· Oh, you don't know?

A. No." *Exh. 1 at 65:19-66:12*.

42.     The remainder of Mijelum's reasoning for making the claim that the Counter-Defendants were responsible for taking the truck in question is equally as speculative:

"Q. So when you filed this report, you don't know if it was taken by them or anyone?

A. They asked me if I had any suspicions of anyone, and those guys were nowhere to be found, **so we thought maybe they took the truck**." *Exh. 1 at 66:13-66:17* emphasis added.


"Q. You also filed a claim against my client for theft. Did you know that?

A. Yeah.

Q. All right. But you don't know if he took it or not?

A. **Well, I wasn't there. There was a possibility.** They weren't answering calls or anything." *Exh. 1 at 66:18-66:24* emphasis added.

"Q. Okay. How do you know when you filed a counter-claim, what is the basis for the claim that it was stolen?

A. That they were gone around that same time. I mean, if they're gone, their truck is gone, they're not answering. They asked me if there's any suspects...

Q. Well, I'm asking you --

A. **They're the only ones who I could think of**. They had access to

it. They knew where the keys were at.

Q. So who are you claiming stole your truck as part of your counter-claim?

A. They did.

Q. Who's "they"?

A.· These guys.

Q. Which ones?

A. Aurelio and -- the guys that were here, Aurelio, Fredy -- well, not Fredy. Aurelio –" *Exh. 1 at 67:02-67:19*.

43.    It is of note that Fredy Pico is one of the people the counterclaim was filed against despite Leon Mucharraz saying he was not.

44.    Leon Mucharraz claimed that he identified the Counter-Plaintiffs in the police report, however their names are not listed. *Exh. 1 at 69:14-69:19; Exhibit 49 – Ector County Sheriff's Incident Report*.

45.    Mijelum does not know which counter-defendant allegedly has the vehicle and is making the claim against the Counter Defendants based on an assumption. *Exh. 1 at 70:06-71:11*.

Q. Okay. So today, you have no knowledge or evidence that any of the plaintiffs took the vehicle?
A. No.
Q. Okay. Any other claims that you have against my clients, other than the counter-claim for which you have no evidence?
A. No. *Exh. 1 at 72:19-72:25*.

46.     Leon Mucharraz later testified that the sole evidence Mijelum has is a text message from "Jorge's sister" discussing the keys to the truck.  *Exh. 1 at 73:01-73:16*.

47.     By its own admission, counter-plaintiff Mijelum cannot show that any of the Counter-Defendants took possession of the vehicle.  The Counter-Defendants should be granted summary judgment as to the Counter-Claim for Conversion.

## SUMMARY JUDGMENT SHOULD BE GRANTED TO THE PLAINTIFFS ON DEFENDANT'S AFFIRMATIVE DEFENSES.

### A. First Affirmative Defense – "The complaint fails to state a claim upon which relief may be granted." *Dkt. 23 at ¶43*.

48.     Failure to state a claim is not a proper affirmative defense:

"District courts have found that failure to state a claim is not an affirmative defense, but rather raises a defect in a plaintiff's complaint. *Herrera v. JK & HE Bus., LLC* 2016 U.S. Dist. LEXIS 142420, at *26 (S.D. Tex. 2016) *citing PNC Bank, Nat'l. Ass'n. v. SM & JH, LLC*, No 4:12-CV-597-JCH, 2012 U.S. Dist. LEXIS 98139, 2012 WL 2905047, at *2 (E.D. Mo. July 6, 2012)("failure to state a claim is not a proper affirmative defense but, rather, asserts a defect in Plaintiff's prima facie case."); *Boldstar Tech., LLC v. Home Depot, Inc.*, 517 F. Supp.2d 1283, 1292 ("Failure to state a claim is a defect in the plaintiff's claim; it is not an additional set of facts that bars recovery notwithstanding the plaintiff's valid   prima facie case. Therefore, it is not properly asserted as an affirmative defense.").

49.     Plaintiffs' Motion for Summary Judgment should be granted as to the affirmative defense of Failure to State a Claim.

**B. Second Affirmative Defense – "Defendant invokes the defenses, protections, and limitations of the Fair Labor Standards Act 29 U.S.C. §201 *et. seq.*" *Dkt. 23 at ¶44.***

50.    This is not a proper affirmative defense as it does not provide any information about what is actually being asserted:

> "In *Biller v. Cafe Luna of Naples, Inc.*, No. 2:14-CV-659-FTM-29DNF, 2015 U.S. Dist. LEXIS 48247, 2015 WL 1648888, at *2 (M.D. Fla. Apr. 13, 2015), the defendants "invoke[d] the defenses, protections and limitations of the Fair Labor Standards Act" as an affirmative defense. The court held that because the defense was "in the broadest possible terms" and did "not provide any information connecting them to [the p]laintiff's claims," it failed to notify the plaintiff of the "issue[ the d]efendants seek to raise and therefore [is] precisely the type of bare-bones conclusory allegation[] that must be stricken." *Id. Fernandes v. VMOC LLC* 2018 U.S. Dist. LEXIS 173166, *4-5 (S.D. Tex. 2018)

51.    See also *Rodriguez v. Physician Lab. Servs., LLC*, No. 7:13-CV-622, 2014 U.S. Dist. LEXIS 27192, 2014 WL 847126, at *2 (S.D. Tex. Mar. 4, 2014) (dismissing a defense 'invok[ing] the statutory limit contained in all statutes relevant to this [FLSA] case and all other defenses therein [for] fail[ing] even the lenient fair notice standard')." *Fernandes at *4-5.*

52.    Plaintiffs' Motion for Summary Judgment should be granted as to the affirmative defense invoking the defenses, protections, and limitations of the Fair Labor Standards Act 29 U.S.C. § 201 *et. seq.*

**C. Third Affirmative Defense – "At all times, Defendant acted in good faith and had reasonable grounds for believing their actions were in compliance with the FLSA." *Dkt. 23 at ¶45.* And "All actions or omissions, if any, were in good faith, and based on good cause and on**

**reasonable grounds for believing that Defendant was complying with the FLSA."** *Dkt. 23 at ¶49.*

53.    Under 29 U.S.C. § 260 an employer may avoid liquidated damages if the employer is able to show that (1) the act or omission giving rise to such action was in good faith and (2) he had reasonable grounds for believing that his act or omission was not a violation of the FLSA.  *29 U.S.C. §260.*

54.    As stated by the Court in *Carmack v. Park Cities Healthcare, LLC* 321 F.Supp. 3d 689 (N.D. Tex. 2018):  "The burden of proving that the two-prong test has been met is upon the employer, 29 U.S.C. § 260 ("if the employer shows to the satisfaction of the Court"); *Thomas v. State of Louisiana*, 348 F.Supp. 792, 796 (W.D. La.1972), who has "the plain and substantial burden of persuading the court by proof that [its] failure to obey the statute was both in good faith and was predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict." (citations omitted)

55.    "The defense requires plain and substantial evidence of at least an honest intention to ascertain what the FLSA requires and to comply with it. *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987) (citing *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 129 (3d Cir. 1984)); *Barcellona*, 597 F.2d at 468-69). "If an employer suspect[s] that [it is] out of compliance with the FLSA, it cannot act in good faith." *Steele v. Leasing Enters., Ltd.*, 826 F.3d 237, 246 (5th Cir. 2016) (citing

*Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1042 (5th Cir. 1999)) (alterations in original). The burden is a difficult one to meet; "double damages are the norm, single damages the exception." *Brock*, 833 F.2d at 19 (quoting *Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 310 (7th Cir. 1986)). Even if the employer carries its burden, the court retains the discretion to award liquidated damages. *Hayes v. McIntosh*, 604 F. Supp. 10, 21 (N.D. Ind. 1984); *Thomas*, 348 F. Supp. at 796." *Carmack* at 707.

56.     In *Tran v. Thai* 2010 U.S. Dist. LEXIS 133130 (S.D. Tex 2010) the Court wrote that: "Courts have held that a demonstration of objective reasonableness requires more than the absence of intent or misunderstanding; there must be "objectively   reasonable grounds for the employer to believe itself in compliance with the Act." *Solis v. Min Fang Yang*, 345 F. App'x 35, 39 (6th Cir. July 10, 2009); see also *Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048, 2007 U.S. Dist. LEXIS 7770, 2007 WL 313483, at *28 (S.D.N.Y. Feb. 1, 2007) ("'Good faith' in this context requires more than ignorance of the prevailing law or uncertainty about its development. It requires that an employer first take active steps to ascertain the dictates of the FLSA and then move to comply with them." (citing *Reich v. Southern New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997))

57.     The *Tran* Court gave a specific example of what fails to meet this good faith standard under 29 U.S.C. § 260:

In *Bolick v. Mgmt. by Skylane, LLC*, the court considered whether the defendant had produced sufficient evidence to support a § 260 good faith defense. Civ. A. No. H-07-2261, 2008 U.S. Dist. LEXIS 81155, 2008 WL 4589961 (S.D. Tex. Oct. 14, 2008). The defendant produced evidence that an executive was not aware of FLSA requirements, sought legal counsel when it created payroll policies, and "always clearly notified its exempt employees that they were paid a specified weekly wage for all hours worked in each workweek, regardless of the number of hours worked." 2008 U.S. Dist. LEXIS 81155, [WL] at *1. The executive also testified that the defendant "has always endeavored to comply with the terms of all applicable state and federal laws, including the [FLSA]." Id. **The court found that the defendants had failed to produce sufficient evidence to withstand summary judgment because there was "no evidence of any specific ongoing efforts by defendant to comply with the FLSA."** *Id. Tran at *20-21 emphasis added.*

58.    In this case, the evidence demonstrates that the Defendant Mijelum did not Act in good faith.

59.    In *Reyes v. Aqua Life Corp.* 632 Fed. Appx. 522, 555-556 (11th Cir. 2015), the Court stated: "An employer who seeks to avoid liquidated damages bears the burden of proving to the court that its violation was 'both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict.' *Reeves v. Int'l Tel. & Tel. Corp., 616 F.2d 1342, 1352 (5th Cir. 1980)* (quoting *Barcellona v. Tiffany English Pub, Inc., 597 F.2d 464, 468 (5th Cir. 1979))*. 'Before a district court may exercise its discretion to award less than the full amount of liquidated damages, it must explicitly find that the employer acted in good faith.' *Joiner v. City of Macon,* 814 F.2d 1537, 1539 (11th Cir. 1987)."

60.    In *Aqua Life* the Court held that testimony by a company vice president who claimed to have done research on the Motor Carrier exemption to the FLSA, yet claimed he had never heard of the FLSA before the suit did not make a sufficient factual showing to find good faith and deny liquidated damages. *Aqua Life* at 556.

61.    Here, the Defendant claims that it didn't know it needed to keep proper time records.  This is despite the fact that Defendant repeatedly entered into sworn agreements that they had read the requirements of the H-2B program and would comply.  *See Exh. 40 at JAS 2046; Exh. 41 at JAS 613*:

> "Each employer covered by this approved Form ETA-9142B has declared under penalty of perjury that it had read and reviewed every page of this approved Form ETA-9142B, including all appendices, and takes full responsibility for the accuracy of all information contained therein and all documentation supporting this approved Form ETA-9142B, including any representations made by the employer's authorized agent or attorney as applicable.  Each employer covered by this approved Form ETA-9142B has attested that it has read, understands, and will abide by all terms, assurances, and obligations as a condition for receiving this approved Form ETA-9142B from the Department."

62.    Both documents require record keeping.  *Exh. 40 at JAS 2044; Exh. 41 at JAS 611.*

63.    The owners and sole decision makers on pay knew that the FLSA required them to pay overtime for hours worked over 40.  *Exh. 1 at 11:24-12:15; Exh. 2 at 17:04-17:06.*

64.    In addition Defendant made representations that overtime would be paid both as part of the H-2B visa process and as part of the highway repair contracts they entered into.  *Exh. 1 at 46:14-47:05 emphasis added. Exh. 22 at Jas 708*; *Exh. 23 at JAS 835; Exh 25 at JAS 1550; Exh. 26 at JAS 1155; Exh. 27 at JAS 998*. They are also required to pay overtime.  *Exh. 22 at JAS 710*; *Exh. 23 at JAS 837; Exh. 25 at JAS 1552; Exh. 26 at JAS 1157; Exh. 27 at JAS 1000; Exh. 22 at JAS 44; Exh. 23 at JAS 872; Exh. 25. at JAS 1616; Exh. 26 at JAS 1190; Exh. 27 at JAS 1082*.

*65.*    Defendant did not consult with any attorney on how to make decisions as to how to comply with labor law.  *Exh. 1 at 12:21-13:16.*

66.    Defendant made no effort to keep documentation regarding how much its employees worked as required by the FLSA.  This is despite representing they would do so, both as part of the H-2B visa process and as part of the contracts they signed.

67.    The Defendant Mijelum does not have time sheets for the Plaintiffs. *Exh. 1 at 76:23-76:24.*  Mijelum does not have records showing the Plaintiffs clocking in or clocking out.  *Exh. 1 at pg. 76:25-77:01.*  Mijelum does not have records showing the Plaintiffs signing in or signing out.  *Exh. 1 at 77:02-77:03.* Mijelum does not have records to verify the time and wage information submitted to TxDOT. *Exh. 1 at 77:04-77:06.*

68.    Leon Mucharraz testified that Defendant does not have records that can dispute the hours the Plaintiffs claim they worked.  *Id.*  Leon Mucharraz claims the only records they have showing hours are the pay records. *Id.*

69.    Leon and Luis Mucharraz were the only ones who worked on or filled out pay records.  *Exh. 1 at* 17:09-20:23; 20:24-22:23.

70.    Leon Mucharraz testified that the Plaintiffs who did not have social security numbers would be paid in cash, not by check.  *Exh. 1 at 24:24-27:12.* However, they would not make records or keep track of those payments.  *Id.*

71.    Nothing that the Defendant has done supports a claim that they acted in good faith.  Plaintiffs should be granted summary judgment as to Defendant's Affirmative Defense of Good Faith.

**D. Fourth Affirmative Defense – "Defendants did not know or show reckless disregard for whether their conduct was prohibited by the FLSA." *Dkt. 23 at ¶46.*  And "Defendant's actions were not intentionally or willfully devised, nor did they operate to violate the requirement of the statutes and/or regulations at issue." *Dkt. 23 at ¶47.* and "Defendant's actions were not undertaken with reckless regard for the requirements of the statutes and/or regulations at issue." *Dkt. 23 at ¶48.***

72.    As stated by the Court in *Tran v. Thai* 2010 U.S. Dist. LEXIS 133130, *15-16 (S.D. Tex 2010) 29 U.S.C. § 259(a) provides an affirmative defense for an employer:

> . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written

administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States specified in subsection (b) of this section, or any administrative practice or enforcement policy of such agency with respect to the class of employers to which he belonged. Such a defense, if established, shall be a bar to the action or proceeding, notwithstanding that after such act or omission, such administrative regulation, order, ruling, approval, interpretation, practice, or enforcement policy is modified or rescinded or is determined by judicial authority to be invalid or of no legal effect.

73.    "The § 259 affirmative defense 'was designed to protect employers from liability if they took certain actions on the basis of an interpretation of the law by a government agency, even if the agency's interpretation later turned out to be wrong.'" *Tran at * 16 citing Alvarez v. IBP, Inc.*, 339 F.3d 894, 907 (9th Cir. 2003)

74.    "Courts have held that to claim an affirmative defense under § 259, the defendant must do more than misunderstand the law; the defendant must rely on a written opinion by the Wage & Hour Division of the Department of Labor." *Tran at *17. See Alvarez*, 339 F.3d at 907 ("Section 259's test also places on employers 'an affirmative duty to inquire about uncertain [FLSA] coverage issues.'" (quoting *Keeley v. Loomis Fargo & Co.*, 183 F.3d 257, 271 (3d Cir. 1999)); *Reich v. IBP*, Inc., 38 F.3d 1123, 1127 (10th Cir. 1994) ("Where there is more than just an honest difference of opinion, such as where a judicial interpretation overrules previously issued administrative opinions, Congress has provided the employer with a defense: sections 9 and 10 of the Portal Act, 29 U.S.C. §§ 258 and 259. But by limiting this defense to good faith reliance on a written opinion, Congress has put the risk of a

close case on the employer."); *Bullard v. Babcock & Wilcox Tech. Servs. Pantex,*

*L.L.C.*, Civ. A. No. 2:07-CV-049, 2009 U.S. Dist. LEXIS 50906, 2009 WL 1704251,

at *8 (N.D. Tex. June 17, 2009) ("'Good faith' requires more than ignorance of the

prevailing law or uncertainty about its application. It requires an employer take

active steps to ascertain the dictates of the FLSA from, for example, the

Administrator of the Wage and Hour Division of the Department of Labor, and then

move to comply with them.").

75.    The sole document or agency opinion that the Defendant has asserted

it relied on is the wage determinations. *Exh. 1 at 12:21-13:16.* However, the wage

determination used and approved for their H-2B visa employees required payment

of overtime. *Exh. 12.* Additionally, the notices of Certification from the Department

of Labor, which allowed Defendant to hire H-2B visa workers specify that the

Defendant has to keep employment, pay, and hour records for three years. *Exh. 40

at JAS 2044; Exh. 41 at JAS 611.*

76.    Yet Defendant did not do that. *Exh. 1 at 76:23-76:24*; *Exh. 1 at pg.

76:25-77:01*; *Exh. 1 at 77:02-77:03*; *Exh. 1 at 77:04-77:06*;

77.    Defendant has not shown that the affirmative defense of no recklessness

or intent under 29 U.S.C. § 259(a) is applicable. Defendant has never alleged that it

did not pay the Plaintiffs overtime due to reliance on any publication.

78.    Plaintiffs should be granted Summary Judgment on Defendant's affirmative defenses that it was not reckless or did not intend to violate the statute.

## E. Fifth, Sixth and Seventh Affirmative Defenses – "The Plaintiff's Claims are barred by the doctrines of wavier, estoppel, and/or laches." *Dkt. 23 at ¶50.*

79.    The general rule is that "It is unclear whether waiver, estoppel, and laches are available defenses under the FLSA." Fernandes v. VMOC LLC, No. CV H-18-1544, 2018 U.S. Dist. LEXIS 173166, 2018 WL 4901033, at *4 (S.D. Tex. Oct. 9, 2018).    The while the Defenses are generally inapplicable in the FLSA context, the Fifth Circuit has recognized some limited fact specific instances where they may apply.  *Brunet v. GB Premium Octg. Servs. LLC* 2024 U.S. Dist. LEXIS 53197, *10 (S.D. Tex 2024).  While these defenses cannot be said to be deficient as a matter of law, they are applicable in limited instances that do not apply to this case. *See Brunet at fn 7.*

### i.    Waiver

80.    "As an initial matter, the Defendant's ability to rely on waiver as an affirmative defense appears questionable. Based on the intent of the Act, it has been a long-established rule that employees may not waive their FLSA rights. *Allen v. City of Tex. City* 2014 U.S. Dist. LEXIS 76533, *13-14 (S.D. Tex. 2014) See *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706, 65 S. Ct. 895, 89 L. Ed. 1296 (1945); *Lee v. Flightsafety Servs. Corp.*, 20 F.3d 428, 432 (11th Cir. 1994); *Tho Dinh*

25

*Tran v. Alphonse Hotel Corp.*, 281 F.3d 23, (2d Cir. 2002); *Reich v. Stewart*, 121 F.3d 400, 407 (8th Cir. 1997); *Morrison v. Executive Aircraft Refinishing, Inc.*, 434 F.Supp.2d 1314, 1319-20 (S.D.Fla. 2005)."

81.    There are three instances where waiver may apply in the FLSA Context. The first is a limited exception under the Fifth Circuit's decision in *Brumbelow v. Quality Mills*, 462 F.2d 1324, 1327 (5th Cir. 1972) where the employee affirmatively misleads the employer about the hours worked. *Coffin v. Blessey Marine Servs.* 2011 U.S. Dist. LEXIS 60485, *4-5 (S.D. Tex. 2011).

82.    The other two are when an employee accepts full payment for unpaid wages as supervised by the Secretary of Labor or when an employee accepts payment under a court-approved settlement. *Coffin at *4-5 Citations omitted*.

83.    None of these exceptions apply.

    a.    *The Plaintiffs did not mislead the employer about hours worked.*

84.    In this case Defendant did not rely on time records kept by the Plaintiffs. Leon Mucharraz testified that they would determine how many hours each employee worked "Just by being there. I mean, we kept—we wrote them down." *Exh. 1 at 30:20-21*. The hours worked were supposedly kept "on a notebook or a planner, or whatever." *Exh. 1 at 30:22-3025*. However Defendant did not keep the records. *Id.* Luis Mucharraz testified that he would sometimes "jot down" how

many hours the employees worked. *Exh. 2 at 11:13-12:01*. He did not keep those records. *Id.*

85.    The limited *Brumbelow* exception only applies when an employee affirmatively misleads the employer about how many hours they worked. *Coffin at \*4-5*. That did not happen in this case and as such the exception does not apply.

      b. *The Plaintiffs did not accept payment of wages under an agreement with the Secretary of Labor.*

86.    There has been no formal agreement with the Department of Labor for any payment to the Plaintiffs as part of an agreement with the Department. *Exh. 46 at ¶10.*

      c. *There has been no payment to the Plaintiffs under a court-approved settlement.*

87.    There has been no other or related suit by Plaintiffs.

88.    Because the evidence shows that none of the narrow instances when Waiver can be asserted in an FLSA case apply, The Plaintiffs' Motion for Summary Judgment should be granted as to the Affirmative Defense of Wavier.

    **ii.    Estoppel**

89.    In order to establish equitable estoppel, the defendant must establish: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of

the facts; (5) who detrimentally relies on the representation. *Allen v. City of Tex. City* 2014 U.S. Dist. LEXIS 76533, *19 (S.D. Tex. 2014).

90.     In *Allen v. City of Tex. City* 2014 U.S. Dist. LEXIS 76533, *18 (S.D. Tex. 2014) the Court pointed out that "Similar to waiver, reservations have been expressed as to the availability of estoppel as an affirmative defense to a claim under the FLSA." See *Caserta v. Home Lines Agency, Inc*., 273 F.2d 943, 946 (2d Cir. 1959); *Burry v. Nat'l Trailer Convoy, Inc*., 338 F.2d 422, 426-27 (6th Cir. 1964); *Handler v. Thrasher*, 191 F.2d 120, 123 (10th Cir. 1951); see *Tran v. Thai*, Civil Action No. H-08-3650, 2010 U.S. Dist. LEXIS 133130, 2010 WL 5232944, at *7 (S.D.Tex. Dec. 16, 2010).

91.     The limited exception to this comes from the same case that provides the exception to Waiver: "Unlike other Circuits, the Fifth Circuit has permitted an employer to rely on the defense of estoppel to an employees' FLSA claim, but it is equally important to point out that it decided the issue based on the vary "narrow facts" that existed in the case. *See Brumbelow v. Quality Mills, Inc*., 462 F.2d 1324, 1327 (5th Cir. 1972) (upholding the application of estoppel defense where an employee   furnished, unbeknownst to the employer, false data by under-reporting hours worked). Absent the "narrow facts" that existed in *Brumbelow*, the availability of the defense of estoppel, like that of waiver, might be questionable. *See Caserta*,

273 F.2d at 946; Burry, 338 F.2d at 426-27; Handler, 191 F.2d at 123." *Allen at \*17-18.*

92.    The narrow exception from *Brumbelow* does not apply, but regardless, the evidence establishes that Estoppel does not apply.

93.    As discussed above, the pay records in this case were created only by Defendant and not in reliance on any representation by any of the Plaintiffs. As such there is no false representation that would form the first element of an estoppel claim, nor the *Brumbelow* exception.

### iii.    Laches

94.    Laches allows a Court to deny relief where a claimant unreasonably delays bringing their claims.

95.    Laches is unavailable as an affirmative defense to an FLSA claim as long as the claim is brought within the applicable statute of limitations. *Brunet v. GB Preminum Octg. Servs. LLC* 2024 U.S. Dist. LEXIS 53197, \*10 (S.D. Tex 2024)

96.    The evidence shows that Plaintiffs brought their claims within the applicable statute of limitations.

97.    In *Pruneda v. Bexar County* 2024 U.S. Dist. LEXIS 133355 (W.D. Tex. 2024) the Court held: "Normally, an FLSA unpaid-overtime claim must be brought "within two years after the cause of action accrued." 29 U.S.C. § 255(a). However, "a cause of action arising out of a willful violation may be commenced within three

years after the cause of action accrued." Id. The plaintiff bears the burden of showing that an employer's violation was willful and thus that a three-year statute of limitations is appropriate. Cox v. Brookshire Grocery Co., 919 F.2d 354, 356 (5th Cir. 1990). Under the FLSA, the statute of limitations period runs until a plaintiff files suit or a putative class member opts-in to a collective action. 29 U.S.C. § 256; Sandoz v. Cingular Wireless LLC, 553 F.3d 913, 916-17 (5th Cir 2008). To demonstrate a willful violation, the plaintiff "must show that the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115 (1988). A negligent violation of the FLSA cannot constitute a willful violation. Mireles v. Frio Foods, Inc., 899 F.2d 1407, 1416 (5th Cir. 1990). Nor can a willful   violation be shown by "a good faith but incorrect assumption that a pay plan complied with the FLSA." McLaughlin, 486 U.S. at 135. *Pruneda at \*7*

98.     The Plaintiffs filed their Original Complaint on June 27, 2023. *Dkt. 1*. As such the two-year statute of limitations looks back to claims up to June 27, 2021.

99.     The 2021 employees worked for Defendant from May 2021 to December 11, 2021. *Exhibit 5 – Statement and translation of Statement of Carvajal at pg. 1*; *Exhibit 6 Statement and translation of Statement of Pico at Bates 142; Exhibit 7 – Statement and translation of statement of Castillo at Bates 195.*

100.    As such the majority of the pay sought falls into the two year statute of limitations.

101.    However, the evidence shows that the three year statute of limitations should apply in this case.  The decision makers on pay both knew they had to pay overtime for hours worked above 40. *Exh. 1 at 11:24-12:15; Exh. 2 at 17:04-17:06.*

102.    Despite that, they did not pay overtime even though the Plaintiffs were working 12-14 hour days.  *Exh. 5 at pg. 2*; *Exh. 7 at pg. 198-199; Exh. 14 pg. 114. Exh. 15 at pg. 118-119. Exh. 5 at pg. 7; Exh. 14 at 114; Exh. 15 at 118-119; Exh. 17 at 2.*

*103.*    The Defendants did not keep contemporaneous time records and then claimed they did not know they needed to despite asserting they would multiple times in H-2B certifications and on contracts. *Exh. 1 at 17:09-20:23; Exh. 40; Exh. 41; Exh. 22 at Jas 708; Exh. 23 at JAS 835; Exh 25 at JAS 1550; Exh. 26 at JAS 1155; Exh. 27 at JAS 998. They are also required to pay overtime.  Exh. 22 at JAS 710; Exh. 23 at JAS 837; Exh. 25 at JAS 1552; Exh. 26 at JAS 1157; Exh. 27 at JAS 1000;*

104.    The Defendant's violation of the FLSA was willful, the Plaintiffs are entitled to the three-year statute of limitations on their claims, and therefore Laches is inapplicable.

105.    Summary Judgment should be granted to the Plaintiffs on Defendant's affirmative defense of laches.

### F. Eighth Affirmative Defense – "The Plaintiffs claims are barred in whole or in part, by the statute of limitations. *Dkt. 23 at ¶51.*

106.    Plaintiffs incorporate their discussion of the Statute of Limitations in the section on Laches above as if fully set out herein.

### G. Ninth Affirmative Defense – "All actions taken by the Defendant with respect to the Plaintiff are supported by legitimate business reasons." *Dkt. 23 at ¶52*

107.    While the FLSA includes good faith defenses, it does not have a legitimate-business-reason defense to overtime claims. *Fernandes v. VMOC LLC* 2018 U.S. Dist. LEXIS 173166, *14 (S.D. Tex. 2018) *citing See Fed .Trade Comm'n. v. Think All Pub.L.L.C.*, 564 F. Supp. 2d 663, 665-66 (E.D. Tex. 2008); FTC v. Liberty Supply Co., No. 4:15-CV-829, 2016 U.S. Dist. LEXIS 99224, 2016 WL 4063797, at *3 n.3 (E.D. Tex. July 29, 2016)

### H. Tenth Affirmative Defense – "In the Alternative, Defendant is entitled to offset monies or other consideration paid or provided to Plaintiffs by Defendants for periods in which Plaintiff was not engaged to work." *Dkt. 23 at ¶53*.

108.    The Fifth Circuit has only allowed the affirmative defense of Offset to be used in a limited number of cases.  *Scherer v. BOK Fin. Corp.* 2023 U.S. Dist. LEXIS 2330, *10 (S.D. Tex. 2023)

109.   The limited exception involved offsetting overpayment of overtime with underpayment of overtime. *Scherer at *11 citing* Singer v. City of Waco. See Singer v. City of Waco, 324 F.3d 813 (5th Cir.2003).

110.   "Since Singer, however, the Fifth Circuit has clarified that the longstanding prohibition of offsets in FLSA cases is the rule and the Singer case is an exception. *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1043 (5th Cir. 2010). The Fifth Circuit only allow offsets when the money paid represents obligations already fulfilled, such as wage payments or advances. *Martin v. PepsiAmericas, Inc.*, 628 F.3d 738, 743 (5th Cir. 2010).

111.   This is inapplicable in this case as there are no allegations of overpayment. The Defendant's assertion is that Plaintiffs never worked over 40 hours and were never paid overtime. *Exh. 1 at 12:21-13:16; Exh. 1 at 31:18-33:04; Exh. 1 at 34:19-35:12; Exh. 2 at 17:01-17:11*.

112.   There is no overpayment to offset and therefore the limited *Singer* exception does not apply.

113.   Plaintiffs should be granted summary judgment on the affirmative defense of Offset.

   I.   **Eleventh Affirmative Defense – "In part, Plaintiff's action is barred because they seek to recover for time that is de minimus work time and thus no (sic) compensable under the FLSA." *Dkt. 23 at ¶54.***

114.    A three part test is used to determine whether time claimed by Plaintiffs is *de minimus*. (1) the administrative difficulty of recording the additional time; (2) the size of the claim in the aggregate; and (3) whether the work was performed on a regular basis. *Jackson v. City of San Antonio* 2006 U.S. Dist. LEXIS 62753,  *43-45(W.D. Tex. 2006)

115.    The evidence demonstrates that the amount of overtime the Plaintiffs are seeking is significant.  They are alleging that they were working 12-14 hours per day on a regular basis and were not being paid correctly.

116.    This is not a situation where an employee is doing a short task before or after work, such as the officers cleaning their weapons in *Jackson*.  These are substantial hours that result in a substantial amount of money owed to the Plaintiffs. This is not a *de minimis* claim.

117.    Plaintiffs should be granted summary judgment on the Defendant's affirmative defense that the work was *de minimis*.

**J.  Twelfth Affirmative Defense – "Plaintiffs have failed to mitigate their alleged damages."** *Dkt. 23 at ¶55*.

118.    Courts have found that as a matter of law "there is no requirement to mitigate overtime wages under the FLSA." *Tran*, 2010 U.S. Dist. LEXIS 133130, 2010 WL 5232944, at *7 (quoting *King v. ITT Educ. Servs., Inc.*, No. 3:09-cv-848, 2009 U.S. Dist. LEXIS 99725, 2009 WL 3583881, at *3 (M.D. Fla. Oct. 27, 2009), and citing G*onzalez v. Spears Holdings, Inc.*, No. 09-60501-CV, 2009 U.S. Dist.

LEXIS 72734, 2009 WL 2391233, at *3 (S.D. Fla. July 31, 2009) (granting a motion to strike mitigation-of-damages affirmative defense because there is no duty to mitigate damages under the FLSA, nor a duty to provide notice as to any alleged unlawful pay practice); *Lopez v. Autoserve LLC*, No. 05 C 3554, 2005 U.S. Dist. LEXIS 29161, 2005 WL 3116053, at *2 (N.D. Ill. Nov. 17, 2005) (granting the plaintiff's motion to strike mitigation-of-damages affirmative defense because there is no duty to mitigate damages under the FLSA); *Perez-Nunez,* 2009 U.S. Dist. LEXIS 25557, 2009 WL 723873, at *2 (granting motion to strike the mitigation-of-damages affirmative defense and holding that a duty-to-mitigate-damages defense based on the plaintiff's failure to timely disclose alleged violations to her employer so that the terms of her employment could be corrected failed as a matter of law under the FLSA))." *Coffin at *6-7.*

119.  As such the Plaintiffs should be granted summary judgment on Defendant's affirmative defense of failure to mitigate.

**PLAINTIFFS SHOULD BE GRANTED SUMMARY JUDGMENT AS TO THEIR CLAIMS UNDER THE FLSA**

120.   In order to prove their claims for failure to pay overtime a Plaintiff must establish four elements. (1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of FLSA; (3) that the employer violated the FLSA's

overtime wage requirements; and (4) the amount of overtime compensation due. *Johnson v. Heckmann Water Res. (CVR), Inc.,* 758 F.3d 627, 630 (5th Cir. 2014.).

121.   It is of note that since the Defendant did not keep track of Plaintiffs' working hours the burden shifting framework established by Supreme Court in *Anderson v. Mt. Clemens Potter Co.* 328 U.S. 680 (1946) applies.

122.   The Plaintiff usually bears the burden of proving he performed work for which he was not compensated.  *Flores v. FS Blinds, L.L.C.* 73 F.4th 356, 362 (5th Cir. 2023).  However, in *Mt. Clemens*, the Supreme Court recognized that the FLSA's recordkeeping regime may inadvertently incentivize employers to "fail[] to keep proper records" because those records may later aid a plaintiff in proving overtime liability. *FS Blinds at 363 citing Mt. Clemens at 687.* ("Such a perverse incentive would "penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work," thereby contravening "[t]he remedial nature of [the FLSA] and the great public policy which it embodies.") *Id.*

123.   When the employer has failed to keep records, or where such records are "inaccurate or inadequate", the plaintiff's evidentiary burden is lessened.  *FS Blinds* at 362 *(citations omitted).*  In those cases, the "plaintiff need only come forward with evidence that shows 'that he has in fact performed work for which he was improperly compensated' and further shows 'the amount and extent' of unpaid

overtime worked 'as a matter of just and reasonable inference.' Under this relaxed standard, a plaintiff need not prove 'the precise extent of uncompensated work,' though he must present more than 'unsubstantiated assertions,' *FS Blinds at 362 citations omitted*.

124.    After the Plaintiff makes that showing, "[t]he burden then shifts to the employer to come forward with evidence that rebuts the plaintiff's claims. The employer can discharge this burden by presenting either 'evidence of the precise amount of work performed or . . . evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.' 'If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.'" *FS Blinds at 362 citations omitted*.

125.    "While the *Mt. Clemens* framework might seem "lenient," it is "rooted in the view that an employer [should not] benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable." *U.S. Dep't of Labor v. Five Star Automatic Fire Prot., L.L.C.*, 987 F.3d 436, 440 (5th Cir. 2021).

126.    As a result, "This leniency [under *Mt. Clemens*] has led us to accept estimates of weekly overtime hours derived from plaintiffs' testimony as adequate evidence[.]"); *FS Blinds at 363*.

**A. First element - that there existed an employer-employee relationship during the unpaid overtime periods claimed;**

127.   With regard to the first step, "the plaintiff must show that he was 'employed' by [his employer] during the periods of time for which he claims unpaid overtime." *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995). "He was employed during those hours if the [employer] had knowledge, actual or constructive, that he was working." Id. (citing *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986)).

128.   Defendant admitted that all of the Plaintiffs were employees of the Defendant in the responses to Requests for Admissions. *See Exhibit 46 – Defendant's Responses to Requests for Admissions at ¶¶13 (Carvajal); 17 (Eduar Garcia) 20 (Elkin Pinto) 23 (Fredy Pico) 27 (Jairo Peña) 30 (Jorge Galvis) 33 (Wilson Castillo) 37 (David Rodriguez).*

129.   Leon Mucharraz also testified that the Plaintiffs had been employed by Defendant. *Exh. 1 at 5:14-6:10.*

## B. Second element - that the employee engaged in activities within the coverage of FLSA.

130.   The FLSA's protections extend to two classes of employees: those engaged "in the production of goods for commerce"—commonly known as individual coverage—and those "employed in an enterprise engaged in commerce or in the production of goods for commerce"—also referred to as enterprise coverage." *Badon v. Berry's Reliable Res., L.L.C.* 2024 U.S. App. LEXIS 26673;

2024 WL 4540334 (5ᵗʰ Cir. 2024 unpublished)(citing to *29 U.S.C. § 207(a)(1)*;

*Martin v. Bedell*, 955 F.2d 1029, 1032 (5th Cir. 1992).

131.  Either individual or enterprise coverage is enough to invoke FLSA

protection. *Martin v. Bedell*, 955 F.2d 1029, 1032 (5th Cir. 1992) (citation omitted

and emphasis original); see also *29 U.S.C. § 207(a)(1)*.

132.  It is of note, that in their responses to Requests for Admissions,

Defendant admitted that each Plaintiff was entitled to overtime under the FLSA.

*Exh. 46 at ¶¶14 (Carvajal); 18 (Eduar Garcia); 21 (Elkin Pinto); 24 (Fredy Pico);*

*28 (Jairo Peña); 31 (Jorge Galvis) 34 (Wilson Castillo) 38 (David Rodriguez).*

### i. The evidence shows that the Plaintiffs had individual coverage under the FLSA.

133.  In determining individual coverage, courts in the Fifth Circuit apply a

"practical test," considering "whether [an employee's] work is so directly and vitally

related to the functioning of an instrumentality or facility of interstate commerce as

to be, in practical effect, a part of it, rather than isolated local activity." *Sobrinio v.*

*Med. Ctr. Visitor's Lodge, Inc*., 474 F.3d 828, 829 (5th Cir. 2007) (per curiam).

"Work that is purely local in nature does not meet the FLSA's requirements, but any

regular contact with commerce, no matter how small, will result in coverage."

*Williams v. Henagan*, 595 F.3d 610, 621 (5th Cir. 2010) (internal brackets and

quotation marks omitted).

134.  All of the Plaintiffs were classified as Highway Maintenance Workers,

and Mijelum's H-2B petition was for Highway Maintenance Workers. *Exh. 8, 9, 10, 11, 12,18, 19, 20 (Work Orders); Exh 40; 41; H-2B Petitions.*

135.   Part 776 of Chapter 29 of the Code of Federal regulations addresses the coverage of the wage and hours provisions of the Fair Labor Standards Act. *29 C.F.R. § 776.*

136.   Part 776.29 addresses employees who work on the instrumentalities and channels of interstate commerce. *29 C.F.R. §776.29.* Under 29 C.F.R. §776.29(c) employees who are repairing or maintaining the instrumentalities of interstate commerce are subject to the FLSA.

137.   An instrumentality of interstate commerce does not need to cross state lines but may operate within a state as part of a system of conduits through which interstate commerce moves. *29 C.F.R. §776.29(b)(1).*

138.   As such Highway Maintenance Workers like the Plaintiffs have individual coverage under the FLSA.

### ii. The evidence shows Defendant was subject to Enterprise coverage.

139.   As to enterprise coverage, the FLSA defines "enterprise engaged in commerce or in the production of goods for commerce" as an enterprise that:

(i)    has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

40

(ii)    is an enterprise whose annual gross volume of sales made or business done is not less than $500,000[.] *29 U.S.C. § 203(s)(1)(A)(i)-(ii)*.

140.    "The first prong of the enterprise coverage definition can be met in one of two ways: (1) through the 'engaged in commerce' clause, which tracks the language used to determine individual coverage and can be analyzed in essentially the same manner; or (2) the 'handling' clause, which requires separate analysis." *Landeros v. Fu King, Inc.*, 12 F. Supp.3d 1020, 1023 (S.D. Tex. 2014).

141.    To establish enterprise coverage under the handling clause, a plaintiff must show that the enterprise "had multiple employees 'handling, selling, or otherwise working on' goods [or materials] that have moved in interstate commerce." *Mendoza v. Detail Sols., LLC*, 911 F. Supp.2d 433, 441 (N.D. Tex. 2012) (quoting 29 U.S.C. § 203(s)(1)(A)(i)) (alteration added). "Courts have held that mere handling of goods or materials that have traveled in interstate commerce creates enterprise coverage." *Badon v. Berry's Reliable Res., LLC*, No. CV 19-12317, 2021 U.S. Dist. LEXIS 126056, 2021 WL 2822252, at *3 (E.D. La. July 7, 2021) (citation omitted).

142.    Here, Defendant Mijelum was "engaged in" interstate commerce.  The employees were working on the instrumentalities of interstate commerce.

143.    Defendant's Tax Returns indicate that they exceeded the $500,000.00 requirement.  *Exhibit 47 – 2021 Partnership Tax Return; Exhibit 48 – 2022 Partnership Tax Return*.

**C. Third element - that the employer violated the FLSA's overtime wage**

**requirements.**

144.   The evidence establishes that the Defendant does not have contemporaneous accurate records of how many hours the Plaintiffs worked. *Exh. 1 at* 17:09-20:23.

145.   Leon and Luis Mucharraz testified that they had records from the LPC tracker that were used to certify Payroll for TxDOT. *Exh. 1 at* 17:09-20:23.

146.   However, Defendant did not keep manual or electronic records stating what time the Plaintiffs started and stopped working each day. *Id*.  They don't have records showing how many hours the Plaintiffs worked in a day or each week. *Id*.

147.   Leon Mucharraz testified that Defendant does not have records that can dispute the hours the Plaintiffs claim they worked. *Id.*  Leon Mucharraz claims the only records they have showing hours are the pay records. *Id*.

148.   However, Leon and Luis Mucharraz were the only ones who worked on or filled out pay records. *Exh. 1 at* 17:09-20:23; 20:24-22:23.

149.   Leon Mucharraz testified that the Plaintiffs who did not have social security numbers would be paid in cash, not by check.  *Exh. 1 at 24:24-27:12*. However, they would not make records or keep track of those payments.  *Id*.

**"**Q. Okay. So you can't tell the court or the jury today how much you paid each of these employees in cash, right?

A. No.

Q. Okay. You can't tell the judge or the jury today whether they were

properly paid for all hours worked because you kept no records of it when you paid them in cash, right?

A.  Probably not, uh-huh.

Q. Okay. And so, with regard to all these employees, you have no way of verifying that they were paid at the proper rate of pay for all the hours worked because you kept no such records, right?

A. Correct." *Exh. 1 at 26:24-27:12.*"

150.   Defendant also did not keep time records.

 *Exh. 1 at 31:18-33:04.*

151.   If a Plaintiff did not have a social security number, Mijelum did not keep records about them.  *Exh. 1 at pg. 50:10-50:17.*

152.   What Defendant tries to rely on are its "certified payroll records." Claiming that these reflect the hours worked.  Defendant has produced sets of "certified payroll records" covering three periods of time, July 10, 2021 to December 25, 2021; April 23, 2022 to June 11, 2022, and August 20 and 27 of 2022. *See Exhibit 28 – July to December 2021 Certified Pay Records; Exhibit 29 – April to June 2022 Certified Pay Records; and Exhibit 30 – August 2022 Certified Pay Records.*

153.   The first set of certified pay records from July to December 2021 only names two of the Plaintiffs, Jairo Peña and Wilson Castillo.  *Exh. 28.* Plaintiffs Aruelio Carvajal, Fredy Pico, and Juan Garcia Rodriguez are not listed.  *See Exh. 28.*

154.   The second set of pay records from April to June of 2023 identifies Fredy Pico, Wilson, Castillo and Aurelio Carvajal working the week of April 23, 2022, May 14, 2022, and May 28, 2022. *Exh. 29.* They records state that Pico and Castillo worked the week of May 21, 22 and that only Carvajal worked the week of June 11, 2022.

155.   The third set of pay records from August 2022 show that Plaintiffs Diaz, Pico and Carvajal worked the week of August 20, 2022, and that Pico worked the week of August 27, 2022. *Exh. 30*.

156.   Even the Defendant's own records demonstrate that these are incomplete and unreliable.  For example, Defendant produced pay stubs for Plaintiff Eduar Garcia for the period of June 26, 2022 to September 17, 2022. *Exhibit 31 Eduar Garcia Paystubs 2022*.  Yet none of these entries appear on the certified pay records.  Similarly, Jorge Galvais has paystubs for the same time period yet is not listed on any of the "certified pay records." *Exhibit 32 – Jorge Galvais Pay stubs 2022*.

157.   Even the paystubs from employees who are on the "certified pay records" conflict.  For example, Wilson Castillo's paystubs claim he was paid for the weeks of April 17-23, May 8-14, May 15-21, May 22-28, May 29-June 4, June 12-18, June 26-July 2, July 10-July 16, July 24-July 30, July 31-August 6, August 7-13, August 14-20, August 21-27, August 28-September 3, September 4-10,

September 11-17, September 25-October 1. *Exhibit 32 – Wilson Castillo Pay Stubs 2022.* The majority of these are not listed on the "certified payroll" records. *See Exhibits 29 and 30.*

158. Additionally, the certified pay records indicate that deductions were made for 401ks for Plaintiff Jairo Peña and Plaintiff Wilson. *See Exh. 28 at pgs. JAS 1668, 1672, 1676, 1680, 1684, 1688, 1692, 1696, 1700, 1703, 1707, 1711, 1715, 1719, 1723, 1727, 1731, 1735, 1739, 1743, 1747, 1751, 1755, 1759 Exh. 29 at pgs. JAS 1763, 1766, 1769, 1772.*

159. However, these employees did not have 401k accounts. *Exhibit 44 – Declaration of Wilson Castillo; Exhibit 45 – Declaration of Jairo Peña.*

160. The certified payroll records are not contemporaneous time records nor do they accurately show all hours worked by Plaintiffs, even when compared to the other scant records provided by the Defendant.

161. The Defendant Mijelum does not have time sheets for the Plaintiffs. *Exh. 1 at 76:23-76:24.* Mijelum does not have records showing the Plaintiffs clocking in or clocking out. *Exh. 1 at pg. 76:25-77:01.* Mijelum does not have records showing the Plaintiffs signing in or signing out. *Exh. 1 at 77:02-77:03.* Mijelum does not have records to verify the time and wage information submitted to TxDOT. *Exh. 1 at 77:04-77:06.*

162.   Leon Mucharraz admitted that the Plaintiffs would work some weekends but that they would only do so if they had worked less than 40 hours during the week. *Exh. 1 at 77:07-77:16*.  However they do not have records show this.  *Id*.  *Exh. 2 at 10:22-12:01*.

163.   Defendant also failed to pay Plaintiffs for transport time.  *Exh. 1 at 81:17-83:24.*

164.   Leon Mucharraz claimed that they would know when the Plaintiffs arrived at the yard and when they departed to the job sites based on the certified payroll. *Exh. 1 at 85:09-86:03*.  But as set out above, the certified payroll documents are incomplete and conflict with other documents produced by Defendant.

165.   Additionally, Leon Mucharraz claimed that they may have had records at the time they did the paychecks but that they "Just don't have them" now:

"Q. And do you know how you came up with these records, the total hours?

A. From what they worked.

Q. But you had no underlying records.

A. It doesn't -- it doesn't mean that we didn't have it at the time when we did the paychecks.

Q. When would you have destroyed them?

A. We didn't destroy them.

Q. Well, when did you lose them?

A. I just don't have them.  I mean, I don't – we didn't keep them.

Q. Well, you're required by federal regulations to keep those records, right?

A. I didn't know that.

Q. You were also required by your contract to keep those records?

A. I didn't know that."

*Exh. 1 at 89:09-89:25*

166.   In fact, under 29 C.F.R. § 516.5, Mijelum, and all other employers are required to keep payroll records for three years.  *29 C.F.R. §516.5*.  All basic time and earning cards with the daily start and stop time of individual employees used to determine wages must be kept for at least two years.  *29 C.F.R. §516.6*.

167.   Additionally, the contracts under which Mijleum worked also required that payroll "and basic records relating thereto" be kept for three years. *See Exh. 22 at JAS 708*.  These include records of daily and weekly hours worked.  *Id*.  Both Leon and Luis Mucharraz reviewed the TxDOT contracts before signing. *Exh. 2 at 07:02-07:17*

168.   As a result, the testimony of the Plaintiffs will satisfy as proof.

**THE PLAINTIFFS WORKED IN EXCESS OF 40 HOURS PER WEEK**

169.   The work day would begin anywhere from 4-7 am. *Exh. 5 at pg. 2*.  The workday would continue until 7-9 pm. *Exh. 5 at pg. 2; Exh. 6 at pg. 142; Exh. 7 at*

*pgs.197-198; Exh. 14 pg. 114; Exh. 15 pgs. 118-119. Exh. 16 at pg. 2*; *Exh. 17 at pg. 2-3*. The Plaintiffs typically worked 12-14 hours per day.

170.   The Plaintiffs worked Monday through Saturday. *Exh. 5 at pg. 2; Exh. 6 at pg. 143 Exh. 14 at pg. 114; Exh. 16 pg. 2; Exh. 17 at pg. 3;* they were also required to work some Sundays. *Exh. 5 at pg. 13 Exh. 6 at pg. 143 Exh. 7 at pg. 197; Exh. 14 at pg. 114; Exh. 16 at pg. 2 Exh. 17 at pg. 3.*

171.   The Plaintiffs were not given lunch time and were expected to work through lunch. *Exh. 5 at pg. 4; Exh. 6 at pg. 142*, *145; Exh. 14 at pg. 114; Exh. 15 at pg. 115.*

172.   Leon Mucharraz told the employees that if they arrived at work at 7 am they were late and if they were leaving at 7 or 8 that they were leaving early. *Exh. 5 at pg. 11-12.* Leon Mucharraz told the Plaintiffs that they were supposed to work from before sunrise until it got dark. *Id.* Leon Mucharraz told the Plaintiffs that if they did not like it, they should let him know and he would send them back to Columbia. *Exh. 6 at pgs. 145-146*; *Exh. 16 at pg. 2.*

173.  Leon Mucharraz would tell the Plaintiffs that he did not want complaints about the work or the schedule and that if he needed them to work on Sunday then they had to. *Exh. 7 at pg.197; Exh. 16 at pg. 2.*

**THE PLAINTIFFS WERE NOT PAID OVERTIME THEY WERE GIVEN A FLAT RATE OF CASH WHEN PAID**

174.   The Plaintiffs were not paid by check.  The Plaintiffs were paid a flat rate of cash ranging from $300 to $700.  *Exh. 5 at pg. 2, 3, 6; Exh. 6 at pg. 142-146; Exh. 7 at 197-198; Exh. 14 at pg. 114; Exh. 15 at 118-119; Exh. 17 at pg. 3.*  Leon and Luis Mucharraz would cash the checks made out to the Plaintiffs but would not give the full amount to the Plaintiffs.  *Exh. 14 at pg.114; Exh. 5 at pg. 12*.

175.   Leon Mucharraz testified that the Plaintiffs who did not have social security numbers would be paid in cash, not by check.  *Exh. 1 at 24:24-27:12*.  However, they would not make records or keep track of those payments.  *Id*.

176.   The payment were frequently late and some of the Plaintiffs did not even get all of the "flat pay" they were owed. *Exh. 6 at pg. 143*; *Exh. 7 at pg. 199-202; Exh. 14 pg. 114; Exh. 15- 119; Exh. 16 at pg. 3*.

177.   If employees complained their pay was reduced.  *Exh. 16 at pg. 2*

178.   The Plaintiffs were interviewed by the Texas Department of Transportation as part of a Labor Standards Review.  Leon and Luis Mucharraz told the Plaintiffs were told to lie to the State about their work hours and pay if they wanted to keep their jobs.  *Exh. 5 at pg. 6; Exh. 6 at pg. 142-143*.  The Plaintiffs were told to tell the state that they were paid $18 to $22 per hour.  *Exh. 5 at pg. 6; Exh. 6 at pg. 143*.  Some of the Plaintiffs were told to give the interviewer a false name.  *Exh. 5 at pg. 6; Exh. 6 at pg. 143*.

**DEFENDANT HAD ACTUAL AND CONSTRUCTIVE KNOWLEDGE OF THE OVERTIME HOURS BEING WORKED**

179.   The Plaintiffs were working at facilities owned by Defendant both before and after their highway maintenance work.  *Exh. 5 at pg. 2*.  They were ordered to work on personal vehicles owned by Leon and Luis Mucharraz.  *Exh. 5 at pg. 3*.The yard was the Mijelum LLC yard and the house the Plaintiffs were required to work on belonged to Luis Mucharraz.  *Exh. 5 pg. 9*.

180.   Leon and Luis Mucharraz would transport the Plaintiffs to and from some job sites.  *Exh. 5 at pg. 11*.

181.   Leon and Luis Mucharraz would become angry if the Plaintiffs stopped to take a lunch break and told them they had to put "los huevos" (Spanish slang for testicles) into the work.  *Exh. 5 at pg. 4*.  The employees were afraid that their pay would be cut if they were seen taking a lunch break.  *Exh. 6 at 142*; *Exh. 14 at. 114*.

182.   Leon and Luis Mucharraz would order Plaintiffs to work at remote locations that would involve long dives.  *Exh. 5 at pg. 4; Exh. 6 at pg. 144*; *Exh. 7 at pg. 198; Exh. 15 at pg. 119*.

183.   Leon and Luis Mucharraz would require the Plaintiffs to work at the Mijleum yard both before and after the highway maintenance work.  *Exh. 5 at pg. 9*.

184.   Leon Mucharraz told the employees that if they arrived at work at 7 am they were late and if they were leaving at 7 or 8 that they were leaving early.  *Exh. 5 at pg. 11-12*.  Leon Mucharraz told the Plaintiffs that they were supposed to work from before sunrise until it got dark.  *Exh. 5 at pg. 11-12; Exh. 07 at 198*. Leon

Mucharraz told the Plaintiffs that if they did not like it, they should let him know and he would send them back to Columbia. *Exh. 6 at pgs. 145-146*; *Exh. 16 at pg. 2.*

185.    Leon Mucharraz would tell the Plaintiffs that he did not want complaints about the work or the schedule and that if he needed them to work on Sunday then they had to. *Exh. 7 at pg.197; Exh. 16 at pg. 2.*

186.    Leon and Luis Mucharraz would require the Plaintiffs to work building a house on land owned by Luis Mucharraz, often on Sundays when the Plaintiffs were not supposed to be working. *Exh. 6 at pg. 144.*

187.    The Plaintiffs would also be ordered to do other work on Sundays. *Exh. 7 at pg. 196.*

**D. Fourth element - the amount of overtime compensation due.**

188.    As discussed above, the Plaintiffs are utilizing the *Mt. Clemons* burden shifting framework to show how much overtime they are owed. As discussed above, under *Mt. Clemons* "a plaintiff need not prove the 'precise extent of uncompensated work,' though he must present more than 'unsubstantiated assertions." *White v. Patriot Erectors, L.L.C.* 2024 U.S. App. LEXIS, *8-9 (5th Cir. Not desig for publication) (citing *Mt. Clemons*) These are the damages for each Plaintiff:

**AURELIO CARVAJAL – 2021 AND 2022**

**2021-**

- Plaintiff Carvajal worked for Defendant from May 13, 2021 to July 11, 2021 – 8 weeks and 5 days = 8.71 weeks. *Exh. 5 at pg. 1,3*
  - From May 13, 2021 to July 11, 2021 he made 7 weeks at $500 1 week at $400. *Exh. 5 at Pg. 2.*
    - Total paid from May 13, 2021 to July 11, 2021 = $3,900.00
  - Plaintiff Carvajal worked from 6:30 am to 8:30 pm. (14hrs) *Exh. 5 at pg. 2.* At 6 days per week 84 hours per week.
  - He should have been paid $19.50 per hour *Exhibit 33 – 2022 Carvajal Paystubs.*
    - Should have made $19.50 x 40 for first 40 hours = $780.00
    - Should have made $29.25 x 44 for next 44 hours = $1,287.00
    - Should have been paid $2,067.00 per six day workweek from May 13, 2021 to July 11, 2021.
  - Carvajal should have been paid $2,067.00 x 8.71 = $18,003.57.  From May 13, 2021 to July 11, 2021, He was Underpaid by $18,003.57 - $3,900.00 = $14,103.57.
- Plaintiff Carvajal worked for Defendant from July 11, 2021 to December 21, 2021 – 23 weeks 2 days = 23.285 weeks. *Exh. 5 at pg. 3.*
  - He was paid was $600 per week.  *Exh. 5 at pg. 3*
    - Total paid from July 11, 2021 to December 21, 2021 is 23.285 x $600 = $10,971 + $3,500 = $13,971.
  - Plaintiff Carvajal should have been paid $2,067.00 x 23.285 = $48,130.00.
    - From July 11, 2021 to December 21, 2021 he was underpaid by $34,159.00.

## 2022

- Plaintiff Carvajal worked for Defendant from April 4, 2022 to September 23, 2022 - 24 weeks 4 days = 24.571 weeks. *(Exh. 5 at pg. 7, 13)*
  - He was paid $600 per week for 22.571 weeks, 2x weeks of $700. *(Exh. 5 at pg. 12, pg. 13.*
  - 22.571 weeks x $600 = $13,542.60 + 2 weeks x $700 = $1,400.00.  Plaintiff Carvajal was paid $14,942.60 for work from April 4, 2022 to September 23, 2022.
  - He should have been paid $2,067.00 x 24.571 = $50,788.25
  - **2022 Total underpaid by $35,845.65**

## EDUAR GARCIA – 2022 ONLY

- Plaintiff Eduar Garcia worked for Defendant from May 12, 2022 to September 23, 2022 = 19 weeks 1 day or 19.142 weeks. *Exh. 23 pgs.  114, Exh. 5 at pg. 14.*
  - He was paid $600 cash for each week worked. *Exh. 23 pg. 114.* Was paid 19.142 x $600 = $11,485.20.
  - Would work 13-14 hours per day 7 days per week. *Exh. 23 pg. 114.*
  - He worked approximately 91 hours per week.
  - He should have been paid $18.92 per hour *Exh. 31.*
  - He should have been paid $18.92 x 40 or $756.80 for the first 40 hours.

- He should have been paid $28.38 x 51 or $1,447.38 per hour for the next 51 hours.
- Plaintiff Garcia's weekly wage should have been $2,204.18.
- He should have been paid $2,204.18 x 19.142 = $42,192.41
- **Underpaid by $30,707.21**

## ELKIN PINTO – 2022 ONLY

- Plaintiff Pinto worked for Defendant from May 12, 2022 to September 23, 2022 *(Exh. 15 pg. 118; Exh. 5 pg. 13)* **May** 12, 2022 to September 23, 2022 = 19 weeks 1 day or 19.142 weeks.
  - He was paid $600 per week totaling 19.142 x $600 = $11,486.20
  - Plaintiff Pinto should have been paid at least $18.92. *Exhibit 34- Pinto H-2B Application.*
  - He would work from 6 am to 7 pm.  Worked at least six days a week. (Exh. 15 pg. 119).  This totals 13 hours a day x 6 days = 78 hours per week.
  - He should have been paid $18.92 x 40 or $756.80 for the first 40 hours.
  - He should have been paid $28.38 x 38 or $1,078.44 per hour for the next 38 hours.
  - His average weekly wage should have been $1,835.24.
  - Plaintiff Pinto should have been paid $1,835.24 x 19.142 = $35,130.16 for his work from May 12, 2022 to September 23, 2022.
  - **He was underpaid by $23,643.96**

## FREDY PICO – 2021 AND 2022

## 2021

- Plaintiff Pico worked for Defendant from May 23, 2021 to December 21, 2021, which is 23.285 weeks *(Exh. 6 pg.142-143)*
  - His pay was $500-$600 per week except the first week which was $400. *(Exh. 6 pg. 142)*
  - $400 + average of $550 on each other week = $550 x 22.285 +$400 = $12,656.75.
  - He should have been paid an hourly rate of $19.50 per hour *Exhibit 35 – Pico Paystubs 2022*
  - Plaintiff Pico worked 85-90 hours per week.
  - On average, he should have been paid $19.50 x 40 totaling $780.00 for the first 40 hours.
  - On average, he should have been paid $29.25 x 47.5 totaling $1,389.37 based on an average of 47.5 hours of overtime per week.
  - His weekly wage should have been $2,169.37
  - Plaintiff Pico should have been paid $2,169.37 x 23.285 weeks or $50,513.78
  - From May 23, 2021 to December 21, 2021, Plaintiff Pico was underpaid by

$37,857.03

## 2022

- Plaintiff Pico worked for Defendant from April 4, 2022 to September 23, 2022 - 24 weeks 4 days = 24.571 weeks. *(Exh. 6 at pg. 144, 145)*
    - His pay was $600 per week.  5x weeks of $700. *(Exh. 6 pg. 144)*
    - 19.571 x $600 = $11,742.60 + 5 x $700 = $3,500.00 = Paid $15,242.60
    - Should have been paid an hourly rate of $19.50 per hour. *Exh. 35*.
    - He worked from 6 to 7 and worked 6 to 7 days a week.  *(Exh. 6 at pg. 144)*
    - On average he worked 84.5 hours a week based on working 13 hours a day 6.5 days a week.
    - On average, he should have been paid $19.50 x 40 totaling $780.00 for the first 40 hours.
    - On average, he should have been paid $29.25 x 44.5 totaling $1,301.62 based on an average of 44.5 hours of overtime per week.
    - His weekly wage should have been $2,081.62
    - Should have been paid $2,081.62 x 24.571 = $51,147.48
    - **2022 Total underpaid by $35,904.88**

## JAIRO PEÑA – 2021 ONLY

- Plaintiff Peña worked for Defendant from May 14, 2021 to November 27, 2021 - 28 weeks 1 days = 28.142 weeks. *(Exhibit 16 pg. 3-4)*
    - He was paid $400 first week then 400 to 500 then increased to $650-$750 after June 20., 2021*(Exhibit 16 pg. 3-4)*
    - Pay was 1 x week at $400, 2x weeks at $500 then 25.142 at average of $700 = $18,999.40
    - Should have been paid $18.53 per hour. *Exhibit 36 –Jairo Peña 2021 paystubs*.
    - He worked 13-14 hour days 6-7 days per week. *(Exh. 16 at pg. 2)*
    - This is an average of 87.75 hours per week based on 13.5 hours for 6.5 days.
    - On average, he should have been paid $18.53 x 40 totaling $741.20 for the first 40 hours.
    - On average, he should have been paid $27.79 x 47.75 totaling $1,326.97 for 47.75 overtime hours.
    - His weekly wage should have been $2,068.17.
    - He should have been paid $2,068.17 x 28.142 weeks totaling $58,202.44.
    - **2021 Total underpaid by $39,203.04**

## JORGE GALVIS – 2022 ONLY

- Plaintiff Galvis worked for Defendant from April 5, 2022 to September 16, 2022 - 23 weeks 3 days = 23.428 weeks. *(Exh. 17 at pg. 2; Exhibit 37 – Galvis Termination letter*
    - Pay was $300 first week (1), then $450 (2), the 500 for 3 months (12) then 600

(7.428) = $11,206.80.
- o His hourly rate should have been $18.92. *Exhibit 38 – Galvis Paystub 2022.* Worked more than 12 hours per day Monday to Saturday. *Exh. 17 at 2.* Had to work some Sundays. *Exh. 7 at 192.*
- o He worked approximately 77 hours per week.
- o He should have been paid $18.92 x 40 totaling $756.80 for the first 40 hours worked.
- o He should have been paid $28.38 x 37 totaling $1,050.06 for the average of 37 hours of overtime worked per week.
- o His average weekly wage should have been $1,806.86
- o He should have been paid $1,806.86 x 23.428 = $42,331.11
- o **2022 Total underpaid by $31,124.31**

## WILSON CASTILLO – 2021 AND 2022

### 2021

- Plaintiff Castillo worked for Defendant from May 24, 2021 to December 21, 2021 – 30 weeks 1 days = 30.142 weeks. *Exh. 7 at 197-198.*
  - o His pay was $400 for first week then $500 per week for 4 weeks until July, it was then $600 per week. *Exh. 7 at pg. 197.* 1 at $400 + 4 at $500 + 25.142 at $600 = $17,485.20 paid.
  - o His hourly rate should have been $18.53 per hour. *Exhibit 39 – Castillo 2021 paystub.*
  - o He worked 13-14 hours per day 6-7 days a week *Exh. 7 at pg. 196)*
  - o Average week was 13.5 hours x 6.5 days or 87.75 hours.
  - o On average, he should have been paid $18.53 x 40 totaling $741.20 for the first 40 hours.
  - o On average, he should have been paid $27.79 x 47.75 totaling $1,326.97 for the 47.75
  - o His weekly wage should have been $2,068.17.
  - o He should have been paid $2,068.17 x 30.142 weeks totaling $62,338.78
  - o Underpaid by $44,853.58

### 2022

- Plaintiff Castillo worked for Defendant from April 5, 2022 to September 15, 2022 - 23 weeks 3 days = 23.428 weeks. *Exh. 7 198, 201*
  - o His pay was $600 per week. 23.428 x $600 = $11,742.60 Paid $14,056.80.
  - o His pay should have been paid 20 per hour *Exh. 32.*
  - o He worked 13-14 hours per day 6-7 days a week *Exh. 7 at pg. 198-199)*
  - o Average week was 13.5 hours x 6.5 days or 87.75 hours.
  - o On average, he should have been paid $20.00 x. 40 totaling $800 for the first 40 hours

- o On average, he should have been paid $30.00 x 47.75 totaling $1,432.50 for the average 47.75 hours of overtime.
- o His average weekly wage should have been $2,232.50
- o Should have been paid $2,232.50 x 23.428 = $52,303.01
- o **2022 Total underpaid by $38,246.21**

## DAVID RODRIGUEZ – 2021

- Plaintiff Rodriguez worked for Defendant from May 14, 2021 to July 11, 2021 – 8 weeks 5 days = 8.428 weeks. 7.428 weeks at $500 1 week at $400. Total paid = $4,114.00
  - o He should have been paid $741.20 + $1,222.98 (assuming 6 days working) = $1,964.18  $1,964.18 x 7.428 = $14,589.92
  - o Underpaid by $10,475.92

- Plaintiff Rodriguez worked for Defendant from July 11, 2021 to December 21, 2021 – 23 weeks 2 days = 23.285 weeks.
  - o Pay was $600 per week.  23.285 x $600 = $10,971 + $3,500 = $13,971.00
  - o Should have been paid $1,964.18 x 23.285 = $45,735.93.
  - o Underpaid by $31,764.93.
  - o **2021 Total underpaid by $42,240.85**

## DEFENDANT DID NOT PAY THE PLAINTIFFS THE PER DIEM THEY WERE OWED

189.    Leon Mucharraz testified that the Plaintiffs were not paid a per diem. *Exh. 1 at pg. 34:10-34:18*. This is despite the fact that they represented to the employees that a per diem would be paid as part of the Job Order they submitted to the Department of Labor.  *Exh. 12 at pg. 2057*.

## THE EVIDENCE SHOWS THE DEFENDANT'S VIOLATION OF THE FLSA WAS WILFUL

190.    Section 255(a) 24 of the Portal-to-Portal Act provides a three-year statute of limitations for willful violations of the FLSA. The standard for willfulness

was established by the Fifth Circuit in *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139, 1142 (5th Cir.1971), cert. denied, 409 U.S. 948, 93 S. Ct. 292, 34 L. Ed. 2d 219 (1972). The Fifth Circuit stated that the test is whether the employer knew the FLSA was in the picture. *Castillo v. Givens* 704 F.2d 181, 193 (5th Cir. 1983). This standard requires that employers have nothing more than "awareness of the possible applicability of the FLSA." *Id.* If an employer merely suspects that his actions might violate the Act, the violation is willful. The Court explained the necessity for this standard as follows:

> "The entire legislative history of the 1966 amendments of the FLSA indicates a liberalizing intention on the part of Congress. Requiring employers to have more than awareness of the possible applicability of the FLSA would be inconsistent with that intent." *Id.*

191.    In this case, Leon Mucharraz and Luis Murcharraz were responsible for determining payroll, rates of pay, and hours of work. *Exh. 1 at 8:21-9:08; Exh. 2 at 5:05-06:14*.

192.    Both Leon Mucharraz and Luis Mucharraz understood that they were required to pay for all regular hours worked up to 40 and time and a half for hours worked in excess of 40 during a week. *Exh. 1 at 11:24-12:15;*

193.    The contracts the work was done under required payment of overtime.

194.    Additionally, the work maintaining vehicles, building houses, and taking care of animals is clearly outside of the scope of work as a Highway Maintenance Worker. This violates the requirements of the H-2B visa program that

the employees must work only in the area of intended employment that was approved as part of the petition.  *Exh. 42; 655 C.F.R. §655.20(x)*

## <u>CONCLUSION</u>

195.  Counter-Defendants' Motion for Summary Judgment should be GRANTED as to Mijleum's cause of action for conversion.  Plaintiff's Motion for Summary Judgment should be GRANTED as to Mijleum's affirmative defenses. Plaintiff's Motion for Summary Judgment should be GRANTED as to their claims under the FLSA>

## <u>PRAYER</u>

WHEREFORE, PREMISES CONSIDERED Plaintiffs/Counter-Defendants pray that this Court GRANT their Motion for Summary Judgment in whole or in part and for such other and further relief to which they are entitled at law or in equity.

**Respectfully Submitted,**

**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Road, Suite 109**
**San Antonio, Texas 78229-3550**
**Telephone: (210) 212-7979**
**Facsimile: (210) 212-5880**

**BY:  */s/Alan Braun*_____**

 **ADAM PONCIO**
 **STATE BAR NO. 16109800**

aponcio@ponciolaw.com
**ALAN BRAUN**
**STATE BAR NO. 24054488**
abraun@ponciolaw.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 17th day of March 2025, a true and correct copy of the foregoing document was electronically served on all counsel of record.

*/s/Alan Braun*
**ALAN BRAUN**