# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **AURELIO TARAZONA CARVAJAL,** | § | |
| **EDUAR HURTADO GARCIA,** | § | |
| **ELKIN HUMBERTO GÓMEZ PINTO,** | § | |
| **FREDY ALEXANDER HERRERA** | § | |
| **PICO, JAIRO ANDRÉS ARDILA** | § | |
| **PEÑA, JORGE ELIECER DIAZ** | § | |
| **GALVIS, WILSON FABIAN PEÑA** | § | **Civil Action No. 3:23-cv-245** |
| **CASTILLO, JUAN DAVID GARCÍA** | § | |
| **RODRIGUEZ** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **MIJELUM, L.L.C.** | § | |

### PLAINTIFFS' POST TRIAL BRIEF

The testimony and evidence establish that the Defendant knew that it was violating the law by having the Plaintiffs perform work outside of the scope of what they were allowed to due under the H-2B visas. The testimony further established that the Defendant knew that it was illegal to pay the Plaintiffs in cash.

These are critical facts because they answer the question of why Defendant does not have documentation of what the Plaintiffs were paid or what hours they worked.

The certified payroll records are incomplete and do not even include some of the Plaintiffs. Additionally, these records do not show the work that the Plaintiffs did at the yard or building Luis Mucharraz's home. Defendant lacks records showing what the Plaintiffs were paid.

If Defendant kept proper time records it would have to create records that told the state that

1

Plaintiffs were performing work outside the scope of what they allowed to do under the H2-B visas. If Defendant kept proper pay records it would have to show that it was paying Plaintiffs in cash. The Defendant did neither because it knew that both the work the Plaintiffs were doing and the manner they were being paid in were illegal. This is not an oversight or mistake by Defendant this is an intentional effort to conceal labor law and contractual violations.

The Defendant now asks this Court to find that even though it intentionally and knowing violated labor laws related to the Plaintiffs that it was properly paying them and that they did not work any overtime.

Defendant wants this Court to believe that it knowing broke multiple labor laws, broke promises it made in its contracts and in the agreements under the H-2B program, conspicuously avoided creating documentation to show those violations, yet in this specific case it followed the law and the Plaintiffs are lying. This is not credible.

In contrast the Plaintiffs' testimony is clear and consistent about the issues of how many hours they worked, what work they did, how they were paid, and how much they were paid. The Plaintiffs are credible.

As such, Plaintiffs ask this Court to award them damages, as detailed below.

## I.
## THE DEFENDANT'S RECORDS ARE NOT CREDIBLE

1.      There are eight workers at issue in this case. Here is what Mijelum's certified payroll records that were admitted into evidence claim the Plaintiffs worked. A detailed chart with specific page citations showing where each date is documented is attached as Appendix A:

| Employee | Dates Worked According to certified payroll records | Source |
|---|---|---|
| Jairo Peña | **77** days from July 6, 2021 to November 12, 2021; <br><br> 22 days from November 15, 2021 to December | *Exhibit 69* |

2

| | 2021; | *Exhibit 70* |
|---|---|---|
| Wilson Castillo | 83 days from July 12, 2021 to November 12, 2021;<br><br>29 days from November 15, 2021 to December 29, 2021 | *Exhibit 69*<br><br><br>*Exhibit 70* |
| | 17 days from April 18, 2022 to May 6, 2022; | *Exhibit 70* |
| Aurelio Carvajal | 13 Days from April 18, 2022 to June 6, 2022; | *Exhibit 70* |
| Freddy Pico | 17 Days from April 18, 2022 to May 26, 2022 | *Exhibit 70* |
| Jorge Galvis | Not present in certified payroll records that were admitted into evidence. | |
| Eduar Garcia | Not present in certified payroll records | |
| David Rodriguez | Not present in certified payroll records. | |
| Elkin Pinto | Not present in certified payroll records | |

2.    This is important because as the testimony established, Defendant's owners repeatedly claimed that they thought they were complying with recordkeeping requirements through the certified payroll records.  These are the documents where the hours worked were allegedly being imputed with information from the handwritten notes that were destroyed.

3.    However, the records admitted into evidence do not even show any hours worked by Plaintiffs Eduar Garcia, David Rodriguez, Jorge Galvis, or Elkin Pinto.  17 days worked by Plaintiff Pico. *(Exhibit 70* at JAS 1760, 1764, 1767.), and 13 days worked by Plaintiff Carvajal. *(Exhibit 70* at JAS 1761, 1764, 1770, 1773).

4.    The records that are present lack credibility.   Jairo Peña testified that he left

3

Mijleum on November 26 or 27 of 2021.  *Exhibit 110* at 33:21-33:23.

5.      Despite that, the certified payroll records show Peña working dates:

| Dates Records show Peña working after he left Mijelum | Citation | Citation to testimony where Peña denies working those dates |
|---|---|---|
| 11/29/21, 11/30/21, 12/01/21, 12/02/21, 12/03/21, 12/04/21 | *Exhibit 70 – JAS 1744* | *Exhibit 110* at 37:16-37:19 |
| 12/07/21, 12/08/21, 12/09/21, 12/10/21, 12/11/21 | *Exhibit 70 – JAS 1754* | *Exhibit 110*  at 37:08-37:11 |
| 12/20/21, 12/21/21, 12/22/21 | *Exhibit 70 - JAS 1756* | *Exhibit 110* at 36:20-37:07 |

6.      Defendant's claim that it believed it was complying with record keeping requirements through the certified payroll records is not credible.  The Defendant completely lacks records for three Plaintiffs and has only a month or less of working days for three others.  Once would have to agree that the Defendant believed it was complying with record keeping requirements by keeping no records.

7.      Pay stubs are not time records, however, even if those are considered evidence of hours worked, they are lacking.  *See United States DOL v. Guess & Co. Kan., L.L.C.* 2026 U.S. Dist. LEXIS 90983, *12 (Kan. 2026)("Despite issuing pay stubs purporting to reflect wage payment, the Wage and Hour investigation found, through employee interviews, that the company did not actually compensate the majority of its employees for any hours worked.")  Defendant's records contain the following.  A more detailed description of each set of records is attached as Appendix B.

| Employee | Date range of check stubs | Total number of check stubs (each stub is for a 1 week period) | Exhibit No. |
|---|---|---|---|
| Aurelio Carvajal | 05/08/22-09/17/22 | 15 | **Exhibit 71** |
| Eduar Hurtado | 06/26/22-09/17/22 | 10 | **Exhibit 72** |
| Elkin Pinto | None | None | |
| Freddy Pico | 05/08/22-09/17/22 | 15 | **Exhibit 74** |
| Jairo Peña | 05/30/21-12/18/21 | 27 | **Exhibit 75** |
| Jorge Galvis | 06/26/22-09/10/22 | 9 | **Exhibit 76** |

4

| Davis Rodriguez | None | None | |
|---|---|---|---|
| Wilson Castillo | 05/30/21-12/18/21 and 04/17/22 to 10/01/22 | 44 | **Exhibit 78** |

8. Defendant's argument that it was acting in good faith and believed it was keeping the required documents falls apart when you look at what they actually have. Different amounts of records are available for each employee.

9. The record in this case shows that each Plaintiff was working for Mijelum for the following periods:

| Employee | Start Date | Stop Date | Weeks Worked |
|---|---|---|---|
| Aurelio Carvajal | May 14, 2021 – *Exhibit 106* at 39:14-39:17 | December 22, 2021 - *Exhibit 106* at 39:14-39:17 | **31 weeks 5 days** |
| | April 4, 2022 – *Exhibit 106* at 24:22-24:25 | September 3, 2022 – *Exhibit 106* at 37:17-37:21 | **21 weeks 5 days** |
| | | | **Total 53 weeks 2 days** |
| Jorge Galvis | April 4, 2022 – *Exhibit 104* at 14:02-14:04 | September 16, 2022 *Exh 76 at JAS 1885* | **23 weeks 4 days** |
| Jairo Peña | May 14, 2021 – *Exhibit 110* at 24:08-24:10 | November 27, 2021 - *Exhibit 110* at 24:08-24:10 | **28 weeks** |
| David Rodriguez | May 15 2021 – *Exhibit 105* at 13:24-14:01 | End of December 2021 – *Exhibit 105* at 40:25-41:01. | **31 weeks 3 days** |
| Eduar Garcia | May 12, 2022 – *Exhibit 111* at 10:06-10:08 | September 10, 2022 - *Exhibit 111* at 19:07-19:08 | **17 weeks 2 days** |
| Freddy Pico | May 23, 2021 – *Exhibit 108* at 31:08-31:13 | December 21, 2021 – *Exhibit 108* at 31:08-31:13 | **30 weeks 2 days** |
| | April 4, 2022 – *Exhibit 108* at 22:09-22:11 | September 3, 2022 – *Exhibit 108* at 22:09-22:11 | **21 weeks 5 days** |
| | | | **52 weeks** |
| Elkin Pinto | May 12, 2022 – *Exhibit 107* at 05:23-06:01 | September 3, 2022 - *Exhibit 107* at 05:23-06:01 | **16 weeks 2 days** |
| Wilson Castillo | April 2021 - *Exhibit 109* at 23:07-23:10. | December 22, 2021 – *Exhibit 109* at 30:07-30:08. | **37 weeks 3 days** |
| | April 4, 2022 – *Exhibit 109* at 33:04-33:06 | September 16, 2022 *Exh. 78 at pg. 1913* | **23 weeks 4 days** |
| | | | **Total 61 weeks** |

10. This means that Defendant is missing the following pay stubs:

Aurelio Carvajal – Defendant has pay stubs for 15 weeks out of a total of 53 weeks 2 days.

Jorge Galvis – Defendant has pay stubs for 9 weeks out of a total of 28 weeks.

Jairo Peña – Defendant has pay stubs for 27 weeks out of a total of 28 weeks, however, Defendant has pay stubs for weeks Peña was not working.

David Rodriguez – Defendant has no pay stubs out of a total of 31 weeks 3 days.

Eduar Hurtado Garcia – Defendant has pay stubs for 10 weeks out of a total of 17 weeks 2 days.

Freddy Pico – Defendant has 15 weeks of paystubs out of a total of 52 weeks.

Elkin Pinto – Defendant has no paystubs out of a total of 16 weeks 2 days.

Wilson Castillo – Defendant has 44 weeks' worth of paystubs out of a total of 61 weeks.

11.     To believe that Defendant acted in good faith one would have to believe that they sincerely believed that they did not have to keep any pay records of any type regarding David Rodriguez or Elkin Pinto.  Neither of these Plaintiffs are present in either the "certified payroll records" or the pay stubs.

12.     Under the FLSA at 29 U.S.C.S § 211(c), Mijelum was required to keep and preserve records of the wages, hours, and conditions and practices of employment.  They did not do so.

13.     Under 29 C.F.R. 516.2(a)(5), Mijelum was required to keep records of the time of day and day of the week on which the employees' work week began.  They did not do so.

14.     On the same submissions, Mijelum reported "401k deductions" taken from the wages of Plaintiffs Jairo Ardila Peña and Wilson Peña Castillo. *Exhibit 69* at JAS 1692. Both men testified under oath that they never had 401(k) accounts at Mijelum, and Mijelum never sponsored any 401(k) plan. *See Exhibit 109* at 58:14–58:17. These entries are false on their face. They were submitted under the criminal-prosecution warning. They were submitted by Luis Mucharraz with

his electronic signature. They are the same body of records Mijelum asks this Court to credit on the question of hours.

15.    An employer who is prepared to make affirmatively false entries on certified payroll forms to a state agency cannot complain when the Court declines to credit other entries on the same forms. The 40-hour figures and the false 401(k) entries appear side by side, in the same Statements of Compliance, signed by the same person.

16.    The Defendant simply did not keep time records at all.  The claim that they believed the obviously faulty certified payroll records or pay stubs would comply with the record keeping requirements Defendant knew it had is simply an excuse concocted to avoid liability

## II.
## THE EVIDENCE SHOWS THE DEFENDANTS KNEW WHAT THEY HAD TO COMPLY WITH AND INTENTIONALLY DID NOT

17.    The Defendant admitted at trial that it knew that it should not have had the Plaintiffs doing work outside of the Highway Maintenance Worker job description.

18.    At Exhibit 103 pages JAS 2063-2064 is an authorization to submit Prevailing Wage Request with Leon Mucharraz's signature.  It states "It is a violation of the H-2B program requirements to employ an H-2B worker outside the area of intended employment, in any activity not listed, or outside the validity period of employment."  It further states "I have reviewed my completed Prevailing Wage request form (ETA 9141) and affirm all of the information is true and accurate.  I hereby authorize FEWA to submit my ETA 9141 to the U.S. Department of Labor." Leon Mucharraz's signature follows.

19.    The Form ETA 9141 follows.  On Page JAS 2070 section F.a.2 asks for the specific services or labor to be performed.  It further states that all job duties must be disclosed.  The section states "Mowing highway right of ways & landscaping highways, remove/install reflective

pavement markings (highway striping), may drive vehicles.

20.    At page JAS 2065, the document states that "Anyone who knowingly and willingly furnishes any false information in the preparation of Form ETA-9141 and any supporting documentation or aids, abets, or counsels another to do so is committing a federal offense punishable by fines, imprisonment or both (18 U.S.C. 2, 1001, 1546,1621)."

21.    Despite that admonishment, Defendant only provided the Highway Maintenance Worker job description, yet had the Plaintiffs do a myriad of other duties building their yard and Luis Mucharraz's home.

22.    The fact that the Defendant is willing to make these misrepresentations calls all of their credibility into question.

23.    The contracts that Defendant entered into contain promises that are relevant to the facts of this case.  The contracts have specific language requiring that each worker be paid no less that once per week in Paragraph 1.a.  *See Exhibit 60* at JAS 834; *Exhibit 61* at JAS 997; *Exhibit 62* at JAS 1154; *Exhibit 64* at JAS 1409; *Exhibit 65* at JAS 1549.

24.    The contracts further require Defendant to keep payroll records for three years in paragraph 3.a. *See Exhibit 60* at JAS 835; *Exhibit 61* at JAS 998; *Exhibit 62* at JAS 1155; *Exhibit 64* at JAS 1410; *Exhibit 65* at JAS 1550.

25.    The contracts also require that overtime be paid at section V. paragraph 1. *See Exhibit 60* at JAS 837; *Exhibit 61* at JAS 1000; *Exhibit 62* at JAS 1157; *Exhibit 64* at JAS 1412; *Exhibit 65* at JAS 1552.

26.    Despite this, the Defendants did not pay Plaintiffs on a weekly basis (see section III D. below); they did not keep payroll records for three years; and they did not pay overtime.

**III.**
**THE DEFENANT'S VIOLATIONS OF THE FLSA ARE WILLFUL**

27.     Critically, the Mucharraz brothers' testimony and the deposition testimony used at trial contain a separate and independently sufficient predicate for willfulness: Leon's express admission that having H-2B workers perform tasks outside their certified job duties "would be a violation of what you agreed to under the H-2B process." Trial testimony and Leon Mucharraz deposition at 46:04–46:07. As the Court will find from the trial testimony of multiple Plaintiffs, that is precisely what happened, repeatedly, and over the course of two H-2B seasons. The combination of FLSA-knowledge admissions, contemporaneous H-2B violations admitted to be unlawful by Mijelum's own principals, and the threats and warnings discussed makes willfulness in this case not merely a permissible finding but the only finding the record supports.

28.     Mijelum's underlying liability under 29 U.S.C. §§ 207(a)(1) and 211(c) rests on three interlocking propositions, each of which is established by the sworn testimony of Mijelum's own owners.

## A.   The Mucharraz Brothers Together Controlled Every Pay, Hours, and Recordkeeping Decision.

29.     There is no factual dispute about who set wages, who set hours, and who decided what records would be kept. Both brothers admitted at trial that they shared full operational authority over each of those decisions:

> "Q. And would you make decisions with regard to pay for employees?  A. We both did.  Q. And you both determined what hours were paid, and what was the rate of pay?  A. Yes.  Q. And you are both responsible for pay of the daily wages?  A. Yes. Q. And the weekly wages, right?  A. Yes." *Luis Mucharraz Deposition* at 06:04– 06:14.

30.     Luis is Mijelum's Rule 30(b)(6) corporate designee. *Luis Mucharraz Deposition* at 20:01–20:04. His admissions therefore bind the company directly. Leon is President, managing member, and the only person who signs the corporate H-2B and TxDOT filings. The two of them together, and no one else at the company, controlled the conduct at issue in this case.

31.     Leon Mucharraz corroborated the absence of time records. He admitted Mijelum had no time cards, no sign-in or sign-out sheets, no punch-in or punch-out, no daily or weekly time logs of any kind. When asked whether he could tell the Court how many hours each Plaintiff actually worked, he conceded he could not and did not contradict his deposition testimony included at trial:

> "Q. Okay. So you can't tell the court or the jury today how much you paid each of these employees in cash, right? A. No. Q. You can't tell the judge or the jury today whether they were properly paid for all hours worked because you kept no records of it when you paid them in cash, right? A. Probably not, uh-huh. Q. … you have no way of verifying that they were paid at the proper rate of pay for all the hours worked because you kept no such records, right? A. Correct." *Leon Mucharraz Deposition* at 26:24–27:12.

**B.      Mijelum Never Paid Overtime, by Its Own Admission.**

32.      Leon Mucharraz admitted that not a single overtime hour was ever paid to any of these Plaintiffs across two H-2B seasons. The justification he offered was that Mijelum "ma[de] it a point not to work overtime" and that paying the certified prevailing wage rate meant Mijelum "technically compl[ied]":

> "A. When we do the application for — for wage … we are given a — an amount that we're supposed to pay our employees. And by paying them that amount or higher, you technically comply. … Q. What about any requirement that you pay for overtime work and all hours worked? A. We make it a point not to work overtime." *Leon Mucharraz Deposition* at 13:01–13:16.

33.      That theory of compliance is foreclosed by the FLSA, by the H-2B regulations (which require time-and-a-half for overtime, see 20 C.F.R. § 655.20(a)(2)), and by Mijelum's own Form ETA-9141 representation that "overtime varies." JX 103 at JAS 2057. The eight Plaintiffs' sworn testimony establishes that overtime hours were worked. Mijelum's own admission that no overtime was ever paid establishes the FLSA violation.

**C.      Willfulness is established on four independent grounds**

34.     Under 29 U.S.C. § 255(a), the FLSA statute of limitations is two years, extended to three years for willful violations. The standard is disjunctive: willfulness exists where the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015). The trial record establishes willfulness on four independent grounds, each of which would suffice standing alone.

### i.   Actual Knowledge of the FLSA Overtime Requirement.

35.     Mijelum's actual knowledge of the FLSA's overtime rule is established by Leon Mucharraz's own sworn testimony in three consecutive admissions:

> *"Q. Okay. Well, the Fair Labor Standards Act requires a number of things. Are you familiar with the Fair Labor Standards Act?  A. To a point, yeah.  Q. Okay. You understand that the Fair Labor Standards Act requires you to pay for all regular hours of work, up to 40 hours per week, right?  A. Yes, sir.  Q. And you understand that you are also required to pay time and a half for any and all hours worked in excess of 40 hours per week, during any regular workweek, correct?  A. Yes, sir. Q. And you understand that if you fail to comply with that, that you could be held liable under the statute?  A. Yes, sir."* Leon Mucharraz Deposition at 11:24–12:15.

36.     Leon Mucharraz conceded three propositions under oath: (1) that the FLSA requires payment for all hours up to forty per week; (2) that the FLSA requires time-and-a-half for every hour over forty; and (3) that the employer can be held liable for failing to comply. Those three concessions satisfy the actual-knowledge alternative under McLaughlin without need to reach reckless disregard.

37.     Luis Mucharraz sat at counsel table during his brother's deposition and trial testimony and heard each of those answers. Both men shared the same operational knowledge of pay and hours.

38.     The question of willfulness has been tried, and Leon Mucharraz did not retreat from his deposition admissions. The question is resolved.

**ii.    Reckless Disregard**.

39.    Independent of the actual-knowledge prong, reckless disregard is established by Mijelum's complete failure to take any steps to comply with the FLSA. Leon Mucharraz admitted at trial and in his deposition that he never consulted an attorney about FLSA compliance:

> "Q. Okay. Have you sought advice, prior to this lawsuit, from any attorney on how to comply with labor statutes, both federal and state?  A. I don't think I have, no." *Leon Mucharraz Deposition* at 12:21–12:25.

40.    Mijelum never contacted the U.S. Department of Labor's Wage and Hour Division. It never contacted the Texas Workforce Commission. It provided no FLSA-compliance training of any kind.

41.    Therefore, reckless disregard is established under the standards articulated in *Singer v. City of Waco*, 324 F.3d 813, 823 (5th Cir. 2003) (knowledge plus no investigation), *Bullard v. Babcock & Wilcox Tech. Servs. Pantex, L.L.C.*, No. 2:07-CV-49-J, 2009 WL 1957560, at *2 (N.D. Tex. July 6, 2009), and *Mohammadi,* 605 F. App'x at 332.

**iii.    Leon Mucharraz expressly admitted that having H-2B visa workers working outside of the scope of the Visa would violate the law.**

42.    There is a third, independent willfulness predicate that has not yet been emphasized but is established directly by Leon Mucharraz's own. Plaintiffs respectfully submit that the Court should make a finding on this point.

43.    When asked at trial about the bounds of the H-2B program, Leon conceded under oath that having Mijelum's H-2B workers perform work outside the scope of their certified H-2B job duties was unlawful:

> "Q. … And if you did [bring them outside the scope], that would be a violation of what you agreed to under the H-2B process, right?  A. That's correct."

44.    That admission is fatal to any claim of innocent error. The H-2B Job Order Mijelum

submitted to DOL, Form ETA-9141, JX 103 at JAS 2057, listed the certified job duties as "Mowing highway right of ways & landscaping highways, remove/install reflective pavement markings (highway striping), may drive vehicles." Mijelum's own immigration agent (FEWA) had written to Leon and warned him, in the very document he e-signed authorizing the application, that "[i]t is a violation of the H-2B program requirements to employ an H-2B worker outside the area of intended employment, in any activity not listed, or outside the validity period of employment." *Exhibit 103* at JAS 2050.

45.     The trial testimony of multiple Plaintiffs establishes that Mijelum's H-2B workers were repeatedly required to perform duties wholly outside the certified scope: feeding and caring for animals at the Mijelum yard (chickens, horses, goats, rabbits, turkeys); cleaning the yard; collecting garbage; cleaning Mijelum's vehicles; repairing apartments Mijelum owned; and, most strikingly, performing concrete and construction work at Luis Mucharraz's personal residence. *See Exhibit 106* at 17:25–18:16; *Exhibit 104* at 21:11–21: 22 (worked 7 a.m. to 8 p.m. at Luis Mucharraz's house on weekends; first month-plus did no highway work at all); *Exhibit 109* at 99:14–100:3; *Exhibit 105* at 30:12–38:25. *Exhibit 111* at 13:17–14:14.

46.     An employer that, by the sworn admission of its principal, knew it was violating the H-2B program's terms by deploying its visa-sponsored workforce outside the certified scope of employment, and did so anyway, repeatedly, across both seasons, cannot credibly claim that its parallel FLSA violations were innocent or in good faith. The same workforce being sent outside its visa scope was the workforce being paid for forty hours regardless of actual hours worked. The same principal who admitted the H-2B-scope violation also admitted the FLSA knowledge. The two streams of admission converge on the same conclusion: Mijelum knew, and Mijelum chose to violate.

13

47.    The H-2B-scope admission also independently establishes reckless disregard for FLSA compliance under *McLaughlin*. An employer who admits that he was violating one body of federal labor law (the H-2B program) governing the same workforce, the same wages, and the same hours, cannot plausibly argue that he was meticulous about a different body of federal labor law (the FLSA) governing the same conduct. The admitted H-2B violation is direct evidence of indifference to federal labor-law constraints generally, which is precisely the mental state *McLaughlin* describes.

### iv.    Defendant's affirmative acts of concealment: coached TxDOT labor interviews, false certified payroll records, and threats to the workforce

48.    Willfulness in this case is reinforced by a pattern of affirmative concealment going well beyond passive non-compliance.

49.    First, the TxDOT labor-interview coaching. Plaintiff Pico's trial deposition testimony confirms it from the receiving end: he testified that on the morning before a TxDOT interview, Luis Mucharraz handed him a paper bearing the false name "Fredy Hugo Valenzuela Ramos" and instructed him to tell the interviewer he was that person, that he worked 40 hours, and that he was paid $18 to $19 per hour. *Exhibit 108* at 18:13–19:25. Castillo testified that TxDOT inspectors arrived at 7:49 a.m. but Mijelum told him "to say that they arrived at 7:00 so that we would get paid." *Exhibit 109* at 47:18–47:22. The TxDOT labor interviews on which Mijelum relies are, by Mijelum's own design, the product of coaching. Luis never denied the coaching at trial.

50.    Second, the falsified Statements of Compliance with their fictitious 401(k) deductions, discussed above. *Exhibit 69* at JAS 1692. An employer prepared to make false certified-payroll entries to a state agency under penalty of criminal prosecution is not an employer plausibly engaged in good-faith compliance with parallel federal wage-and-hour requirements.

51.     Third, and as discussed in Section IV below, the threats and warnings issued to the Plaintiffs themselves. Those threats corroborate that Mijelum was conscious of the wrongfulness of its conduct, sought to prevent disclosure to investigators, and took affirmative steps to deter the workforce from complaining about the conditions the Court is now hearing of.

52.     Plaintiff Herrera Pico testified that on the morning before a State of Texas labor interview, Luis Mucharraz personally handed him a paper bearing a fictitious name ("Fredy Hugo Valenzuela Ramos"), told him to identify himself to the State worker by that name, and instructed him to say that he worked 40 hours and was paid $18 to $19 per hour. *Exhibit 108* at 18:13–19:25.

53.     Jairo Peña testified that during a prior season's State of Texas inspection Leon Mucharraz gathered the workers and warned them that if the State learned of the actual low pay rates Mijelum was paying, Mijelum would lose its TxDOT contract, and the workers would lose their jobs. *See Exhibit* 110 at 18:15–18:23. That testimony establishes that Mijelum's pattern of warning and coaching the workforce predated this lawsuit and was used as a means of suppressing accurate disclosure of pay and hours to the agencies charged with oversight.

54.     This Court should find that Mijelum's violations of 29 U.S.C. § 207(a)(1) were willful within the meaning of 29 U.S.C. § 255(a) and *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988); apply the three-year statute of limitations; and award liquidated damages in an amount equal to the unpaid wages under 29 U.S.C. § 216(b), Mijelum's good-faith defense under § 260 having been struck at summary judgment (Mem. Op. at 25–26).

**IV.**
**THE PLAINTIFFS ARE CREDIBLE AND CONSISTENT**

The Plaintiffs' testimony is consistent on numerous fact issues in this case.

  *A. The Plaintiffs worked more than 8 hours a day*.

15

55.     All of the Plaintiffs testified about the amount of hours they worked per day.  Each testified that they worked 12-14 hours per day:

**Aurelio Carvajal:** In 2021 Carvajal started working at 6-6:30 in the morning and went to 8 to 9 at night.  *Exhibit 106* at 16:23-17:03.  Highway work would start as early as 5:00 am and go as late as 9:00 p.m. *Exhibit 106* at 21:18-22:01. In 2022 Carvajal started working anywhere from 5:00 to 8:30 in the morning and went to 8:30 or 9:00 at night.  *Exhibit 106* at 26:03-26:11. They worked 12-14 hours per day in 2021.  *Exhibit 106* at 40:25-41:21; *29:03-29:06*.

**Wilson Castillo:** In 2021, Castillo would have to arrive at the yard at 5:30-6:00 in the morning and work until 8:30-9:00.  *Exhibit 109* at 26:02-26:23.  Castillo would work 13 hours per day in 2021. *Exhibit 109* at 30:09-30:23.  Castillo worked 14-14 hour days in 2022. *Exhibit 109* at 35:25-36:13.

**Jorge Galvis:** Galvis initially worked 12 hours per day.  *Exhibit 104* at 18:02-18:12. When Galvis started doing highway work he would have to get to the yard at 5:00 in the morning to get everything ready for the road work that was scheduled for 7:00 am to 5:00 pm. *Exhibit 104* at 22:07-22:24; 23:15-23:19. Galvis worked more than 12 hours a day when he did the El Paso road work. *Exhibit 104* at 29:06-29:20.  He worked more than 12 hours a day doing bridge work. *Exhibit 104* at 32:14-33:05.

**Eduar Garcia:** Garcia testified that they would start working at 5:00 in the morning and worked 12-14 hour days.  *Exhibit 111* at 11:16-12:01.

**Fredy Pico:** Pico started working 60-70 hours per week which increased to 75-90. *Exhibit 108* at 14:11-14:18; Pico worked 13-14 hour days in 2021. *Exhibit 108* at 17:11-17:13.  He did the same in 2022. *Exhibit 108* at 23:21-23:24.

**Elkin Pinto:** When Pinto started working for Mijelum he worked from 6:00 in the morning to 7:00 or 8:00 at night. *Exhibit 107* at 12:13-12:17.

**David Rodriguez:** When Rodriguez first started working for Mijelum he would work from 6:00 in the morning to 9:00 at night. *Exhibit 105* at 19:12-19:16.  This continued once they started working lane closures.  *Exhibit 105* at 22:19-22:21. Rodriguez would sometimes have to get to the yard at 4:00 or 5:00 in the morning to start the road closure work. *Exhibit 105* at 24:03-24:18.

*B.     The Plaintiffs worked 6-7 days a week.*

56.     Each of the Plaintiffs testified that they worked 6 days a week during most weeks and worked 7 days a week some weeks.

16

**Aurelio Carvajal**: In 2021 Carvajal worked Monday through Saturday and two Sundays. *Exhibit 106* at 19:23-20:02. In 2022 Carvajal worked six days a week Monday through Saturday and Sundays when required. *Exhibit 106* at 27:20-27:22.

**Wilson Castillo**: In 2021 Castillo would work 6-7 days a week. *Exhibit 109* at 27:04-27:12. He worked the same hours in 2022.  *Exhibit 109* at 56:17-56:25.

**Jorge Galvis**: Jorge Galvis worked Monday to Saturday or Monday to Sunday. *Exhibit 104* at 26:13-26:19.

**Eduar Garcia**: Garcia worked 6 or 7 days a week. *Exhibit 111* at 16:04-16:15.

**Fredy Pico**: Pico worked six days a week and some Sundays in 2021. *Exhibit 108* at 17:14-17:16.  He did the same in 2022. *Exhibit 108* at 23:25-24:02.

**Elkin Pinto**: Pinto worked six days a week. *Exhibit 107* at 12:18-12:20.

**David Rodriguez**: Rodriguez worked Monday through Saturday when he started working for Mijelum. *Exhibit 105* at 19:17-19:18.

C.    *Defendant paid the Plaintiffs in cash.*

57.    Each Plaintiff testified that some or all of the payments they received from the

Defendant were cash payments.

**Aurelio Carvajal:** Carvajal was almost always paid in cash the first year. *Exhibit 106* at 19:03-19:06.  In 2022 Carvajal got some checks but they would not have the full amount of work done and he would not get the full amount of cash when the checks were cashed.  *Exhibit 106* at 33:03-33:18.

**Wilson Castillo:** Castillo got payments in both check and cash in 2021. *Exhibit 109* at 27:24-28:09.

**Jorge Galvis:** Galvis was always paid in cash with one exception. *Exhibit 104* at 19:02-19:14; 34:14-34:20.

**Eduar Garcia:** Garcia was paid in cash. *Exhibit 111* at 12:07-12:08.

**Fredy Pico:** Pico was paid in cash. *Exhibit 108* at 15:05-15:09; 24:12-24:17.

**Elkin Pinto:** Pinto was paid in cash.  He was not given checks. *Exhibit 107* at 13:08-13:16.

**David Rodriguez:** Rodriguez was always paid in cash. *Exhibit 105* at 20:04-20:14.

D.    *The Plaintiffs were not always paid on a weekly basis*

58.    The Defendant's testimony at trial stated that the Plaintiffs would be paid for the previous week's work and that the Plaintiffs did not understand that.  This misstates the Plaintiffs' issue with the frequency of payment.  The Plaintiffs consistently testified that they would not be paid for 2-3 weeks at a time.

> **Aurelio Carvajal:** Carvajal was not always paid on a weekly basis.  *Exhibit 106* at 18:17-19:02.

> **Wilson Castillo:** Sometimes Castillo was paid weekly, sometimes every 2 or 3 weeks.  *Exhibit 109* at 27:20-27:23.

> **Jorge Galvis:** There was not a usual payday. *Exhibit 104* at 18:22-18:23; *26:20-27:13.*

> **Eduar Garcia:** Garcia would be paid every 2-3 weeks.  *Exhibit 111* at 12:02-12:06.

> **Fredy Pico:** Pico was paid every 2-3 weeks. *Exhibit 108* at 14:18-14:22; *24:03-24:07.*

> **David Rodriguez:** There were times where Rodriguez had to wait 2-3 weeks to be paid. *Exhibit 105* at 19:23-19:25.

E.    *The Plaintiffs were not given the proper amount of cash payment/the amount of cash given did not reflect what the paystubs stated.*

59.    The Plaintiffs consistently testified that when they got cash they did not get the full amount reflected on the paystubs, if any.

> **Aurelio Carvajal:** Carvajal was initially given $500.00 per week without documentation to show what hours were worked.  *Exhibit 106  at* 19:07-19:12.

> **Jorge Galvis:** Galvis would get $500 when he worked a week of 12 hour days. *Exhibit 104* at 20:14-21:01.

> **Eduar Garcia:** Garcia got $600 in cash per week worked regardless of how many hours he worked. *Exhibit 111* at 14:15-14:19.

F.    *The Plaintiffs did work outside the scope of the highway work they were authorized to do under the H2-B program.*

60.      The Plaintiffs did many different jobs at Mijelum's yard and building Luis Mucharraz's house that went outside the scope of what they were allowed to do under the H-2B visa program.

**Aurelio Carvajal:** In 2021 the first job he did was working building apartments at Mijelum's yard and feeding animals. *Exhibit 106* at 16:06-16:25. In 2022 Carvajal worked at the yard and on a home Luis Mucharraz was building. *Exhibit 106* at 27:23-28:11.

**Wilson Castillo:** In 2021 Castillo was assigned car maintenance and repair work at Mijelum's yard. *Exhibit 109* at 24:22-25:04. Castillo also performed work building a home for Luis Mucharraz. *Exhibit 109* at 26:19-27:03. In 2022 Castillo started laying cement at the yard. *Exhibit 109* at 35:10-36:02. They did work making a horse corral and took care of animals. *Exhibit 109* at 36:14-36:19.

**Jorge Galvis:** The first job Galvis did in 2022 was concrete work at the yard. *Exhibit 104* at 15:04-15:24. They also did work taking care of animals. 15:25-16:24. Galvis also worked building Luis Mucharraz's house. *Exhibit 104* at 21:02-21:14.

**Eduar Garcia:** Garcia did concreate work, maintained vehicles and took care of animals for 12-14 hours per day. *Exhibit 111* at 13:10-14:02. Garcia did work on Luis Mucharraz's house. *Exhibit 111* at 15:15-16:03.

**Fredy Pico:** When Pico started working for Mijelum in 2021 he took care of the animals and did work around the yard. *Exhibit 108* at 13:05-13:11. When Pico returned in 2022 the first work he did was concreate work at the yard. *Exhibit 108* at 23:08-23:20.

**David Rodriguez:** When Rodriguez started working for Mijelum in 2021 the first work he did was cleaning the yard and taking care of the animals. *Exhibit 105* at 15:22-17:07. He also built apartments on the yard and put up metal structures. *Exhibit 105* at 19:02-19:10

**Elkin Pinto:** Pinto did work at the yard taking care of animals and building Luis Mucharraz's house. *Exhibit 107* at 13:22-14:13.

G.      *The Plaintiffs would do work outside the scope of the H2-B program before and after they were done with the state highway work.*

61.      A key issue in this case is the fact that the Plaintiffs would do work at Mijelum's yard in the hours before and after they did work on the highways. These hours would not appear

on any of the certified payroll records submitted to the state.  As previously discussed, Mijelum knew that work would violate the H-2B program requirements and was illegal.  As such a great deal of the uncompensated overtime hours came from this work before and after the state highway work.

> **Aurelio Carvajal:** Carvajal would work in the yard after finishing highway work. *Exhibit 106* at 22:08-22:14.

> **Wilson Castillo:** Castillo would do work at the yard after they were done with highway work.  *Exhibit 109* at 37:03-37:10.

> **Jorge Galvis:** Galvis would do work at the card on the concrete and with the animals after working the road closures. *Exhibit 104* at 24:03-24:24.

> **Freddy Pico:** Pico would do work at the yard after completing highway work for the day. *Exhibit 108* at 13:12-14:06.

> **Elkin Pinto:** They would do work at the yard after finishing highway work. *Exhibit 107* at 14:17-15:07; 16:18-17:06.

> **David Rodriguez:** Rodriguez did work at the yard after completing lane closures. *Exhibit 105* at 22:19-23:08; 25:04-25:19.

> H.    *The Plaintiffs were told to provide false information if asked.*

62.    Multiple Plaintiffs testified that they were told to provide false information about their working conditions and identities if they were questioned by state employees.

> **Jorge Galvis:** Galvis was told that if anyone from the State came to talk to him that he had to say that he was making $18.92 and working 8 hours a day. *Exhibit 104* at 30:25-31:06.

> **Fredy Pico:** Pico was told to provide a false name if questioned by the state. *Exhibit 108* at 18:17-20:01.

> I.    *Plaintiffs were told they would only actually be paid a set amount.*

63.    Two of the Plaintiffs also testified that they were told by Leon Mucharraz that they would only be paid a set amount, regardless of how many hours they worked.

**Jorge Galvis:** Leon Mucharraz told Galvis that he would only be paid a set amount when Galvis questioned why he was not being paid $18.92 per hour as promised. *Exhibit 104* at 31:19-32:10.

**David Rodriguez:** Leon Mucharraz told Rodriguez they would only pay him $500 per week regardless of what work was done. *Exhibit 105* at 36:14-36:17.

*J.  Conclusion: The Plaintiffs are consistent and credible.*

64.    The Plaintiffs' testimony is consistent regarding the key issues in this case.

## V.
## <u>DEFENDANT'S ARGUMENT THAT THE PLAINIFFS DID NOT STOP WORKING FOR THEM DUE TO THE CONDITIONS IS UNPERSUASIVE</u>

65.    One of Defendant's arguments is that if the conditions were so bad, why did the Plaintiffs continue to work for Mijelum?  This argument is unpersuasive for two reasons, first that the Plaintiffs continued working for Mijelum out of necessity, and second the testimony established that they did leave Mijelum because of the working conditions.

*A.  Plaintiffs worked for Defendant out of necessity.*

**Aurelio Carvajal:** Returned to work for Mijelum in 2022 out of necessity and because he was told there would be better pay. *Exhibit 106* at 23:14-23:18.

**Wilson Castillo:** Castillo returned to Mijelum in 2022 because the economic situation in Columbia was poor. *Exhibit 109* at 33:11-33:14.

**Freddy Pico:** Pico returned to work at Mijelum in 2022 because he could not earn enough money in Columbia. *Exhibit 108* at 21:16-21:23.

*B.  The Plaintiffs did stop working for Defendant because of the poor conditions.*

66.    At trial the Defendant argued that the fact that the Plaintiffs continued working for them undercut the Plaintiffs' claims about working conditions.  However, the evidence shows that the Plaintiffs did in fact quit because of the working conditions.

**Aurelio Carvajal:** Carvajal left Mijelum because of the incorrect pay and amount of hours they were working. *Exhibit 106* at 37:23-38:04.

**Jorge Galvis:** Galvis left because he was not pleased with the pay or living conditions. He also had to do a lot of work and was not being paid on time. *Exhibit 104* at 34:02-34:13; 53:01-53:13.

**Eduar Garcia:** Garcia left because he did not like the pay and treatment they were receiving. *Exhibit 111* at 19:09-19:11.

**Fredy Pico:** Pico left Mijelum in September 2022 when treatment got worse. *Exhibit 108* at 27:04-27:21.

**Elkin Pinto:** Pinto stopped working for Mijelum because they were not paying him for all hours worked. *Exhibit 107* at 19:12-19:15.

**David Rodriguez:** Rodriguez did not return to Mijelum after 2021 because of the working conditions. *Exhibit 105* at 41:05-41:13.

## VI.
## THE PLAINTIFFS SHOULD BE AWARDED DAMAGES

### A. METHODOLOGY

67.    This damage model is constructed under the Mt. Clemens burden-shifting framework, which applies in this case. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946); *Flores v. FS Blinds, L.L.C.*, 73 F.4th 356, 362 (5th Cir. 2023).

68.    Because Defendant kept no contemporaneous time records, the model uses Plaintiff's testimony as to the hours actually worked, and applies Defendant's own certified prevailing-wage rate as the regular rate.

69.    The weekly proper wage is calculated under 29 U.S.C. § 207(a)(1) as the regular rate multiplied by forty hours, plus one-and-a-half times the regular rate multiplied by the hours worked in excess of forty. The weekly underpayment is the difference between the weekly proper wage and the actual weekly amount paid. The Plaintiff's unpaid-overtime damages are the sum of the weekly underpayments across the weeks worked.

70.    Liquidated damages are calculated as a sum equal to the unpaid wages under 29 U.S.C. § 216(b). The model assumes a three-year statute of limitations applicable to willful

22

violations under 29 U.S.C. § 255(a) and *McLaughlin v. Richland Shoe Co*., 486 U.S. 128 (1988). All hours and weekly-pay amounts used here are conservative selections within the range of each Plaintiff's designated trial-deposition testimony.

### B. AGGREGATE SUMMARY OF DAMAGES

71.    The following table sets out per-Plaintiff unpaid-wage damages and total damages with liquidated damages, summing to an aggregate award.

| Plaintiff | Season(s) | Unpaid Wages (§ 207) | Liquidated (§ 216(b)) | Total (with Liquidated) |
|---|---|---|---|---|
| Aurelio Tarazona Carvajal | 2021 & 2022 | $77,732.07 | $77,732.07 | **$155,464.13** |
| Eduar Hurtado Garcia | 2022 | $22,333.51 | $22,333.51 | **$44,667.02** |
| Elkin Humberto Gómez Pinto | 2022 | $22,413.11 | $22,413.11 | **$44,826.22** |
| Fredy Alexander Herrera Pico | 2021 & 2022 | $80,379.81 | $80,379.81 | **$160,759.62** |
| Jairo Andrés Ardila Peña | 2021 | $25,635.36 | $25,635.36 | **$51,270.72** |
| Jorge Eliecer Diaz Galvis | 2022 | $18,630.20 | $18,630.20 | **$37,260.41** |
| Wilson Fabián Peña Castillo | 2021 & 2022 | $83,740.47 | $83,740.47 | **$167,480.95** |
| Juan David García Rodríguez | 2021 | $44,444.00 | $44,444.00 | **$88,888.00** |
| **AGGREGATE TOTAL — ALL PLAINTIFFS** | | **$375,308.54** | **$375,308.54** | **$750,617.08** |

**Aggregate unpaid-wage damages: $375,308.54.**

**Aggregate damages with liquidated damages: $750,617.08.**

### C. PER-PLAINTIFF NARRATIVE SUMMARIES

72.    Each Plaintiff's individual damage model with full citation to the designated trial-deposition testimony, complete per-period calculation tables, and per-year breakdowns is set out below. The following narrative summaries reproduce the headline figures and identify the testimonial basis for each.

**AURELIO TARAZONA CARVAJAL EMPLOYMENT DATES AND RATE OF PAY**

### i.   *Employment Dates*

73.     May 14, 2021 to December 22, 2021; *Exhibit 106* at 39:14-39:17; April 4, 2022 to September 3, 2022. *Exhibit 106* at 24:22-24:25, 37:17-37:21.

### ii.   *Hours Worked*

74.     12-14 hours per day, Monday through Saturday plus Sundays when required. *Exhibit 106* at 16:23-17:03; 21:18-22:01; 26:03-26:11; 40:25-41:21; 29:03-29:06.

75.     Conservative estimate: 84 hrs/wk (14 hrs × 6 days). Upper bound estimate: 91 hrs/wk. 84 base + 7 hrs avg Sunday work; Sundays required per testimony.

### iii.   *Weekly Pay*

76.     $500 per week for the first portion of 2021, $600 per week after three Mexican coworkers left; $600 per week in 2022, regardless of hours. *Exhibit 106* at 39:22–40:08; 43:6–43:11.

### iv.   *Applicable Hourly Rate*

77.     $18.92 in 2021 per H-2B documentation; *Exhibit 106* at 40:17:40:19. $19.50 per hour in 2022 per Defendant's 2022 paystubs. *See Exhibit 22*.

### AURELIO CARVAJAL DAMAGES CALCULATION

**2021 Season**

78.     Regular rate: $18.92 per hour. Overtime rate (1.5×): $28.38 per hour.

79.     Conservative scenario: 84 hours per week (14 hours × 6 days, Monday-Saturday).

80.     Upper-bound scenario: 91 hours per week (84 base + 7 hours average Sunday, per testimony of "Sundays that were required").

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| First seven weeks at $500/week | 7 | $500.00 | 84 | $2,005.52 | **$10,538.64** | 91 | $2,204.18 | **$11,929.26** |
| Remaining 25.143 weeks at $600/week (after pay raise) | 25.14 | $600.00 | 84 | $2,005.52 | **$35,338.99** | 91 | $2,204.18 | **$40,333.90** |
| YEAR SUBTOTAL | | | | | **$45,877.63** | | | **$52,263.16** |

**2022 Season**

81.    Regular rate: $19.50 per hour. Overtime rate (1.5×): $29.25 per hour.

82.    Conservative scenario: 84 hours per week.

83.    Upper-bound scenario: 91 hours per week (84 base + average Sunday work).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| All 21.714 weeks at $600/week | 21.71 | $600.00 | 84 | $2,067.00 | **$31,854.44** | 91 | $2,271.75 | **$36,300.38** |
| YEAR SUBTOTAL | | | | | **$31,854.44** | | | **$36,300.38** |

### SUMMARY OF DAMAGES – AURELIO CARVAJAL

| Description | Conservative | Upper Bound |
|---|---|---|
| Unpaid overtime wages — 2021 | $45,877.63 | $52,263.16 |
| Unpaid overtime wages — 2022 | $31,854.44 | $36,300.38 |
| **Total unpaid wages (29 U.S.C. § 207)** | **$77,732.07** | **$88,563.54** |
| Liquidated damages (29 U.S.C. § 216(b)) | $77,732.07 | $88,563.54 |
| **TOTAL DAMAGES (with liquidated)** | **$155,464.13** | **$177,127.07** |

### EDUAR HURTADO GARCIA EMPLOYMENT DATES AND RATE OF PAY

*i.    Employment Dates*

84.    May 12 to September 10, 2022. *Exhibit 111* at 6:15–6:20.

25

ii.    *Hours Worked*

85.    Plaintiff worked 12 to 14 hours per day. *Exhibit 111* at 13:25–14:02; He had the same hours across all assignments *Exhibit 111* at 15:25–16:07; Plaintiff worked 80 hours per week. *Exhibit 111* at 20:09–20:17.

86.    Conservative estimate: 80 hrs/wk. Upper bound: 91 hrs/wk (14 hrs × 6.5 days, consistent with 12-14 hrs × 6-7 days testimony).

iii.    *Weekly Pay*

87.    $600 per week; did not change with hours. *Exhibit 111* at 14:15–14:19.

iv.    *Applicable Hourly Rate*

88.    $18.92 per hour, $28.38 overtime, per H-2B documentation. *Exhibit 111* at 20:02–20:08.

## EDUAR HURTADO GARCIA -  DAMAGES CALCULATION

**2022 Season**

89.    Regular rate: $18.92 per hour. Overtime rate (1.5×): $28.38 per hour.

90.    Conservative scenario: 80 hours per week (per p. 21:22 testimony).

91.    Upper-bound scenario: 91 hours per week (14 hrs × 6.5 days, consistent with 12-14 hrs × 6-7 day's testimony).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| All 17.286 weeks at $600/week | 17.29 | $600.00 | 80 | $1,892.00 | $22,333.51 | 91 | $2,204.18 | $27,729.86 |
| YEAR SUBTOTAL | | | | | $22,333.51 | | | $27,729.86 |

**SUMMARY OF DAMAGES — HURTADO GARCIA**

| Description | Conservative | Upper Bound |
|---|---|---|
| Unpaid overtime wages — 2022 | $22,333.51 | $27,729.86 |
| **Total unpaid wages (29 U.S.C. § 207)** | **$22,333.51** | **$27,729.86** |
| Liquidated damages (29 U.S.C. § 216(b)) | $22,333.51 | $27,729.86 |
| **TOTAL DAMAGES (with liquidated)** | **$44,667.02** | **$55,459.71** |

**ELKIN HUMBERTO GOMEZ PINTO EMPLOYMENT DATES AND RATE OF PAY**

    i.    *Employment Dates*

92.    May 12 to September 3, 2022. *Exhibit 107* at 5:23–6:01.

    ii.    *Hours Worked*

93.    About 80 hours per week. *Exhibit 107* at 21:18–21:22.

94.    Conservative: 80 hrs/wk (his testified estimate). Upper bound: 87 hrs/wk (consistent with parallel testimony of other 2022 workers on same crews).

    iii.    *Weekly Pay*

95.    $600 per week, cash; *Exhibit 107* at 13:07–13:11. Paid for 14 weeks; first week unpaid as 'deposit' and last week unpaid. *Exhibit 107* at 21:01–21:17.

    iv.    *Applicable Hourly Rate*

96.    $18.92/hour. *Exhibit 103* at JAS 2029; Exhibit 73 at JAS 1817.

**ELKIN PINTO   DAMAGES CALCULATION**

**2022 Season**

97.    Regular rate: $18.92 per hour. Overtime rate (1.5×): $28.38 per hour.

98.    Conservative scenario: 80 hours per week (per testimony p. 21:22).

99.    Upper-bound scenario: 87 hours per week (consistent with parallel testimony of

other 2022 workers on same crews).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| 14 weeks paid at $600/week | 14 | $600.00 | 80 | $1,892.00 | **$18,088.00** | 87 | $2,090.66 | **$20,869.24** |
| 2.286 weeks entirely unpaid (first week 'deposit'; last week upon departure) | 2.29 | $0.00 | 80 | $1,892.00 | **$4,325.11** | 87 | $2,090.66 | **$4,779.25** |
| YEAR SUBTOTAL | | | | | **$22,413.11** | | | **$25,648.49** |

### SUMMARY OF DAMAGES — GÓMEZ PINTO

| Description | Conservative | Upper Bound |
|---|---|---|
| Unpaid overtime wages — 2022 | $22,413.11 | $25,648.49 |
| **Total unpaid wages (29 U.S.C. § 207)** | **$22,413.11** | **$25,648.49** |
| Liquidated damages (29 U.S.C. § 216(b)) | $22,413.11 | $25,648.49 |
| **TOTAL DAMAGES (with liquidated)** | **$44,826.22** | **$51,296.98** |

### FREDY ALEXANDER HERRERA PICO EMPLOYMENT DATES AND RATE OF PAY

i. *Employment Dates*

100.    May 23, 2021 to December 21, 2021. *Exhibit 108* at 31:11–31:13.

ii. *Hours Worked*

101.    70-90 hours per week, average 85, including Sundays. *Exhibit 108* at 33:13–33:18; 13-14 hours per day × 6-7 days per week. *Exhibit 108* at 17:14-17:16; 23:25-24:02. Conservative estimate: 85 hrs/wk (midpoint of testified 70-90 range). Upper bound: 90 hrs/wk (high end of testified range per *Exhibit 108* at 33:18).

iii. *Weekly Pay*

102.    $400 first week, then $500-$600/week. *Exhibit 108* at 31:14–31:21; Paid $500-

28

$600 in cash per week both years *Exhibit 108* at 32:13–32:24.

      iv.    ***Applicable Hourly Rate***

103.    $18.53 in 2021; $19.50 in 2022. *See Exhibit 54* at JAS 590; *Exhibit 74* at JAS 1824-1838.

**FREDY PICO DAMAGES CALCULATION**

**2021 Season**

104.    Regular rate: $18.53 per hour. Overtime rate (1.5×): $27.80 per hour.

105.    Conservative scenario: 85 hours per week (midpoint of testified 70-90 range).

106.    Upper-bound scenario: 90 hours per week (upper end of testified range per Deposition 33:18).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| First week at $400 | 1 | $400.00 | 85 | $1,991.98 | **$1,591.98** | 90 | $2,130.95 | **$1,730.95** |
| 29.143 remaining weeks at $550 average ($500-$600 range) | 29.14 | $550.00 | 85 | $1,991.98 | **$42,023.48** | 90 | $2,130.95 | **$46,073.63** |
| YEAR SUBTOTAL | | | | | **$43,615.45** | | | **$47,804.58** |

**2022 Season**

107.    Regular rate: $19.50 per hour. Overtime rate (1.5×): $29.25 per hour

108.    Conservative scenario: 85 hours per week (same schedule as 2021).

109.    Upper-bound scenario: 90 hours per week (upper end of testified range).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| All 24.571 weeks at $600/week | 24.57 | $600.00 | 85 | $2,096.25 | **$36,764.36** | 90 | $2,242.50 | **$40,357.87** |

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| YEAR SUBTOTAL | | | | | $36,764.36 | | | $40,357.87 |

### SUMMARY OF DAMAGES – FREDY PICO

| Description | Conservative | Upper Bound |
|---|---|---|
| Unpaid overtime wages — 2021 | $43,615.45 | $47,804.58 |
| Unpaid overtime wages — 2022 | $36,764.36 | $40,357.87 |
| **Total unpaid wages (29 U.S.C. § 207)** | **$80,379.81** | **$88,162.44** |
| Liquidated damages (29 U.S.C. § 216(b)) | $80,379.81 | $88,162.44 |
| **TOTAL DAMAGES (with liquidated)** | **$160,759.62** | **$176,324.89** |

### JORGE DIAZ GALVIS EMPLOYMENT DATES AND RATE OF PAY

i. *Employment Dates*

110.    April 5 to September 16, 2022. *Exhibit 104* at 8:22–13:20.

ii. *Hours Worked*

111.    12 hours per day at the yard, first month. *Exhibit 104* at 18:02-18:12; 22:07-22:24; 23:15-23:19. 60 hours per week in third week, Monday through Friday. *Exhibit 104* at 49:21–50:07. Weekend work at Luis Mucharraz's house, 7 a.m. to 8 p.m. *Exhibit 104* at 21:02–21:14.  72 hours per week when worked Monday through Saturday. *Exhibit 104* at 50:15-50:23.

112.    Conservative: 60 hrs/wk in regular weeks (M-F × 12 hrs). Upper bound: 72 hrs/wk in regular weeks (6 days × 12 hrs, including testified weekend work at Luis Mucharraz's house)

iii. *Weekly Pay*

113.    $300 first week for 3 days.  *Exhibit 104* at 19:02–19:04. $400 second week for 4 days/48 hours.  *Exhibit 104* at 20:07-20:08. $500 most of the time, sometimes $550, $600 toward

30

end. *Galvis Deposition* at 18:09–18:14.

iv.    ***Applicable Hourly Rate***

114.    $18.92 regular, $28.38 overtime, per H-2B documentation. *Exhibit 104* at 16:23–

17:04.

### JORGE DIAZ   DAMAGES CALCULATION

**2022 Season**

115.    Regular rate: $18.92 per hour. Overtime rate (1.5×): $28.38 per hour.

116.    Conservative scenario: Variable per testimony: 36 / 48 / 60 hours per week.

117.    Upper-bound scenario: Variable per testimony: 36 / 48 / 72 hours per week (weeks

3+ include weekend work at Luis Mucharraz's house).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| Week 1: 3 days × 12 hours = 36 hours, paid $300 | 1 | $300.00 | 36 | $681.12 | **$381.12** | 36 | $681.12 | **$381.12** |
| Week 2: 4 days × 12 hours = 48 hours, paid $400 | 1 | $400.00 | 48 | $983.84 | **$583.84** | 48 | $983.84 | **$583.84** |
| Weeks 3+ (21.428 weeks): conservative 60 hours per week, upper-bound 72 hours per week (including testified weekend work at Luis Mucharraz's residence); paid $500 average | 21.43 | $500.00 | 60 | $1,324.40 | **$17,665.24** | 72 | $1,664.96 | **$24,962.76** |
| YEAR SUBTOTAL | | | | | **$18,630.20** | | | **$25,927.72** |

### SUMMARY OF DAMAGES — DIAZ GALVIS

| Description | Conservative | Upper Bound |
|---|---|---|
| Unpaid overtime wages — 2022 | $18,630.20 | $25,927.72 |
| **Total unpaid wages (29 U.S.C. § 207)** | **$18,630.20** | **$25,927.72** |
| Liquidated damages (29 U.S.C. § 216(b)) | $18,630.20 | $25,927.72 |
| **TOTAL DAMAGES (with liquidated)** | **$37,260.41** | **$51,855.45** |

### WILSON FABIEN PEÑA CASTILLO EMPLOYMENT DATES AND RATE OF PAY

#### i.    *Employment Dates*

118.    Started May 24, 2021. *Exhibit 109* at 23:07-23:10; Worked through December 22, 2021. *30:07-30:08;* April 4 to September 16, 2022. *33:04-33:06 - Exhibit 78* at JAS 1913.

#### ii.    *Hours Worked*

119.    13 to 14 hours a week. *Exhibit 109* at 70:25–70:05. Conservative estimate: 87.75 hrs/wk (13.5 × 6.5 days). Upper bound: 98 hrs/wk (14 hrs × 7 days, upper end of testified range).

#### iii.    *Weekly Pay*

120.    Castillo was paid $500 to $600 per week there was one week where he was paid $650 and another where he was paid $400. *Exhibit 109* at 27:13-27:19.

#### iv.    *Applicable Hourly Rate*

121.    $18.53 in 2021. *Exhibit 109* at 22:17–23:02; $18.92 in 2022, OT $28.38. *Exhibit 109* at 57:22–58:02.

### WILSON CASTILLO DAMAGES CALCULATION

**2021 Season**

122.    Regular rate: $18.53 per hour. Overtime rate (1.5×): $27.80 per hour.

123.    Conservative scenario: 87.75 hours per week (13.5 hours × 6.5 days average).

124.    Upper-bound scenario: 98 hours per week (14 hours × 7 days, upper end of testified range).

32

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| Week 1 at $400 | 1 | $400.00 | 87.75 | $2,068.41 | **$1,668.41** | 98 | $2,353.31 | **$1,953.31** |
| Weeks 2-5 at $500/week | 4 | $500.00 | 87.75 | $2,068.41 | **$6,273.65** | 98 | $2,353.31 | **$7,413.24** |
| Remaining 25.143 weeks at $600/week | 25.14 | $600.00 | 87.75 | $2,068.41 | **$36,920.26** | 98 | $2,353.31 | **$44,083.47** |
| **YEAR SUBTOTAL** | | | | | **$44,862.32** | | | **$53,450.02** |

**2022  Season**

125.    Regular rate: $18.92 per hour. Overtime rate (1.5×): $28.38 per hour.

126.    Conservative scenario: 87.75 hours per week.

127.    Upper-bound scenario: 98 hours per week (upper end of testified range).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| All 25.714 weeks at $600/week | 25.71 | $600.00 | 87.75 | $2,111.95 | **$38,878.15** | 98 | $2,402.84 | **$46,358.23** |
| **YEAR SUBTOTAL** | | | | | **$38,878.15** | | | **$46,358.23** |

### SUMMARY OF DAMAGES — PEÑA CASTILLO

| Description | Conservative | Upper Bound |
|---|---|---|
| Unpaid overtime wages — 2021 | $44,862.32 | $53,450.02 |
| Unpaid overtime wages — 2022 | $38,878.15 | $46,358.23 |
| **Total unpaid wages (29 U.S.C. § 207)** | **$83,740.47** | **$99,808.25** |
| Liquidated damages (29 U.S.C. § 216(b)) | $83,740.47 | $99,808.25 |
| **TOTAL DAMAGES (with liquidated)** | **$167,480.95** | **$199,616.50** |

### JUAN DAVID GARCIA RODRIGUEZ EMPLOYMENT DATES AND RATE OF PAY

#### i.   *Employment Dates*

128.   Eight months, May through December 2021; *Exhibit 105* at 30:12–38:25.

#### ii.   *Hours Worked*

129.   6 a.m. to 9 p.m. 15 hours per day; hours; six days per week. *Exhibit 105* at 30:12–38:25. Conservative: 80 hrs/wk. Upper bound: 90 hrs/wk (15 hrs × 6 days, per testimony of 6 a.m. to 9 p.m. workday).

#### iii.   *Weekly Pay*

130.   $500/week most of the time; once paid $300; three times paid $600. *Exhibit 105* at 30:12–38:25.

#### iv.   *Applicable Hourly Rate*

131.   $18.92/hour. *Exhibit 77* at JAS 1902. (Consistent with 2021 H-2B prevailing-wage certification for parallel hires).

### DAVID RODRIGUEZ   DAMAGES CALCULATION

**2021   Season**

132.   Regular rate: $18.92 per hour. Overtime rate (1.5×): $28.38 per hour.

133.   Conservative scenario: 80 hours per week (conservative reduction from testified range).

134.   Upper-bound scenario: 90 hours per week (15 hours × 6 days, per testimony of 6 a.m. to 9 p.m. workday).

| Pay Period | Weeks | Weekly Pay | CONSERVATIVE SCENARIO | | | UPPER-BOUND SCENARIO | | |
|---|---|---|---|---|---|---|---|---|
| | | | Hrs/Wk | Weekly Proper | Period Unpaid | Hrs/Wk | Weekly Proper | Period Unpaid |
| 28 weeks at $500/week (most of his employment) | 28 | $500.00 | 80 | $1,892.00 | **$38,976.00** | 90 | $2,175.80 | **$46,922.40** |
| One week paid $300 | 1 | $300.00 | 80 | $1,892.00 | **$1,592.00** | 90 | $2,175.80 | **$1,875.80** |
| Three weeks paid $600 | 3 | $600.00 | 80 | $1,892.00 | **$3,876.00** | 90 | $2,175.80 | **$4,727.40** |
| **YEAR SUBTOTAL** | | | | | **$44,444.00** | | | **$53,525.60** |

### SUMMARY OF DAMAGES — GARCÍA RODRÍGUEZ

| Description | Conservative | Upper Bound |
|---|---|---|
| Unpaid overtime wages — 2021 | $44,444.00 | $53,525.60 |
| **Total unpaid wages (29 U.S.C. § 207)** | **$44,444.00** | **$53,525.60** |
| Liquidated damages (29 U.S.C. § 216(b)) | $44,444.00 | $53,525.60 |
| **TOTAL DAMAGES (with liquidated)** | **$88,888.00** | **$107,051.20** |

## VII.
## CONCLUSION

135.    The Defendant's argument lacks credibility at a fundamental level.  They did not keep time records or even records of all hours worked.  This was not an innocent mistake, the Defendant knew it was violating multiple labor laws by paying Plaintiffs in cash, having them do work outside of the scope of what was authorized by the H-2B visa, and were not paying them for all hours worked/overtime.

136.    Defendant knew it was violating the law and did not keep records in order to avoid leaving a paper trail.

137.    In contrast, the Plaintiffs story is consistent and credible across all Plaintiffs.  Under the Plaintiffs have met the *Mt. Clemens* standard by proving that they performed work for which

35

they were improperly compensated and by producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).

138.   The Plaintiffs have also shown that the Defendants actions were willful. Willfulness occurs where the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. *Mohammadi v. Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015) *citing McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133 (1988);

139.   Reckless disregard is shown where an employer knew of the FLSA's basic requirements yet took no steps to comply. *See Singer v. City of Waco*, 324 F.3d 813, 822 (5th Cir. 2003). The Fifth Circuit has emphasized that "good faith requires more than ignorance of the prevailing law or uncertainty about its application. It requires that an employer take active steps to ascertain the dictates of the FLSA…" *Bullard v. Babcock & Wilcox Tech. Servs. Pantex, L.L.C.,* 2009 U.S. Dist. LEXIS 50906 at *23 (N.D. Tex. June 17, 2009).

140.   The Defendant knew what it had to comply with and intentionally failed to do so.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs ask this Court to enter a Judgment in their favor and award them damages for the Defendant's violations of the Fair Labor Standards Act and for such other and further relief to which they are entitled at law or in equity.

**Respectfully Submitted,**

**/s/ Alan Braun**
**Adam Poncio**
**State Bar No. 16109800**
**aponcio@ponciolaw.com**
**Alan Braun**
**State Bar No. 24054488**
**abraun@ponciolaw.com**

**PONCIO LAW OFFICES**
**A Professional Corporation**
**5410 Fredericksburg Rd., Suite 109**
**San Antonio, Texas  78229**
**Telephone: (210) 212-7979**
**Facsimile:   (210) 212-5880**

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June 2026, I electronically filed the foregoing with

the Clerk of the Court using CM/ECF system and served on all counsel of record:

*/s/ Alan Braun*
**ALAN BRAUN**